ELIZABETH MILLER, Minor, ETC., Appellee, v. THOMAS
MILLER, *et al.,* Appellants.

**Parent and Child:** ADOPTION:    CUSTODY:    EVIDENCE.    The ᾽legal
adoption of a· child under the law of this state, which is pre-
sumed to be the law elsewhere, can only be made by appropri-
ate writings duly recorded; short of this there is but the right
of custody, which in all cases is presumed to be temporary un-
less the contrary intention is unequivocally made to appear.
Evidence considered and held insufficient to show a clear, defin-
ite and absolute relinquishment by a 'parent to another of all
right to his infant child.

**Habeas Corpus:** COMPENSATION FOR CARE OF CHILD.  In a habeas cor-
pus proceeding to obtain the custody of a minor child whose
father resided in Scotland, an Act of Parliament which provides
for compensation for care upon restoration of the child where
it appears the parent has abandoned or deserted the child, was
properly disregarded, there being no evidence of abandonment
or desertion.

**Habeas Corpus:** ADOPTION:    EVIDENCE.  In a habeas corpus proceed-
ing to recover possession of a child instituted by its parent by
adoption against those having received its custody from the na-
tural parent, the evidence is considered and held to support a
decree awarding the child to the parent by legal adoption.

**Judgments:** CONSIDERATION OF MATTERS OUTSIDE THE RECORD:    NEW
TRIAL.  The recital in a decree that upon consideration of the
evidence "and all other matters coming to the knowledge of
the court" the court came to the conclusion, etc., does not viti-
ate the order and is not ground for a new trial, where there is
no showing that improper matters were considered or that a
consideration thereof was material ground. upon which the
court was moved to judgment, especially where the record sup-
ports the decree.

*Appeal from Polk District Court.*—HON. C. P. HOLMES,
Judge.

WEDNESDAY, FEBRUARY 17, 1904.

HABEAS CORPUS proceedings instituted in the name of Elizabeth Miller, a minor, by James Miller and K. E. Miller, as her next friends and parents by adoption, to determine the right to the custody of said minor. The trial court awarded the custody to said James and K. E. Miller, and the defendants appeal.—*Affirmed.*

*Bowen & Brockett* for appellants.

*Thomas A. Cheshire* for appellee.

BISHOP, J.—Many of the facts upon which a solution of this controversy must depend are not in dispute. Elizabeth Miller, named as plaintiff, is the daughter, by birth, of James and Mary Murphy, and she was born in Scotland, December 30, 1899. A few days after her birth, her mother died. The father had four other children, and plaintiff was given into the custody of the defendants in this proceeding, Thomas Miller and Marion, his wife—the former a brother of Mary Murphy—who then resided in Scotland. A short time thereafter, Thomas Miller and his wife came to this country, bringing the child with them. They settled in Polk county, this state, and the child remained in their custody up to the time of the judgment in the court below. In March, 1901, formal articles of adoption were entered into and executed by and between James Murphy, father of the child, who still resided in Scotland, of the one part, and James Miller and K. E. Miller, his wife—the former a cousin of Mary Murphy—residing in Des Moines, of the other part, by the terms of which the said child was given to, and became the adopted child of the latter, with all the rights and responsibilities incident to proceedings of that character. Demand was thereupon made upon Thomas Miller and Marion Miller for the custody of the child, and, such demand being refused, this proceeding was brought.

The record presents two questions for our determination—one, the general question whether the order made by the

1. ADOPTION: custody: evidence.    trial court fixing the custody of the child was warranted by the facts shown upon the hear-

ing, and the law applicable thereto; the other, whether the
trial court erred in overruling the application made by de-
fendants to set aside the order made fixing custody and for
a new trial.

Appellants do not question the validity of the articles of
adoption. This may be accepted as equivalent to an admis-
sion that whatever of legal right was possessed by Thomas
Murphy, the father, as of the date of the articles, passed to,
and became vested in, James and K. E. Miller. As it is the
law of this state—made so by statute—that parents are en-
titled to the custody of their minor children, and as the
adopted parents in this case are above reproach in point of
moral character, are intelligent, and have sufficient means to
properly care for and educate the child, we may proceed upon
the theory that the order of the trial court was warranted and
proper, unless the record discloses some superior right to cus-
tody on the part of the defendants. Of course, the best in-
terests of the child should be kept in mind at all stages of
consideration.

Having this outline of the situation before us, we may
at once proceed to examine into the claim for retention of
custody as made by defendants. At the time of the birth of
the child, and the death of Mary, his wife, Murphy resided
about fifteen miles from the city of Glasgow, and the defend-
ants resided in said city. In answer to a telegram announcing
the death of Mrs. Murphy, defendant Marion Miller went
to the Murphy home. In respect of what transpired there,
she testifies as follows: "I went up in the morning, and
when I went in the father was crying, and he looked up and
said, 'Do you know, it is Mary's last request that you should
have this baby?' and he asked me to take the baby. I says,
'I will take the baby on condition that you give it to me as
my own forever, because I will take nobody's child unless I
get it to keep forever.' He went and got the birth papers,
and gave me the child and the papers. He gave me the baby
to keep forever. He said he wanted me to have it, because
it was Mary's last request, and said he would never consent

to take the child from me. I said to him, 'It seems to me there ought to be some writings of this,' and he said, 'There ought not to be any trouble or expense, for it was Mary's request that you should have the baby.' When he gave me the papers, he said, 'Name the baby whatever you please,' and I said, 'I read the papers, Elizabeth Murphy. My mother's name is Elizabeth, and I can put Mary to it.' He said, 'That is all right.' That is how I got the baby." Mrs. Miller further testifies that she remained some days at the Murphy home, and that when she returned to her own home she took the baby with her; that, after the lapse of about nine months, she, with her husband, came to this country, bringing the baby with them. The testimony thus given by Mrs. Miller is not the subject of contradiction, save that J. S. Miller and his wife—the former a brother of defendant Thomas Miller —as witnesses for plaintiff, each testify that defendant Marion Miller told them on an occasion preceding the trial that before leaving Scotland she had gone to James Murphy several times to get adoption papers, and that he refused to give them; also that she got ready two or three times to go up and notify Murphy that they were about to leave Scotland, and that, if he wanted to take the child before they left, then was the time to do so; that her husband refused to permit her to do so; and that they left the country without Murphy's knowledge or consent. The making of such statements by Marion Miller is not denied. Over the objection of defendants, a letter written by Thomas Murphy in December, 1900, and addressed to James Miller, was introduced and read in evidence. In such letter the writer strongly asserts that the removal of the child to this country by defendants was unauthorized, and therein the request is made that the child be adopted by said James W. Miller and his wife. This letter was certainly incompetent to establish any fact bearing upon the relations between Murphy and the defendants, but it was receivable as tending to explain the attitude of James W. Miller, and as bearing upon the *bona fides* of his intentions —matters material to be considered by the court.

Such being the facts presented by the record bearing upon this phase of the case, we are bound to consider the legal rights of the parties precisely as though James Murphy was before us, making claim to the custody of his child. This must be true for the reason that by the articles of adoption he could not confer any higher or greater rights than he himself possessed. Accordingly the primary inquiry suggested is, what rights in respect of the child, growing out of the arrangement with Murphy, did defendants acquire? To our minds, it is manifest that nothing more than the custody of the child, for the time being, at least, can be said to have been within the contemplation of the parties. Under the law of this state—and we will presume that the same rule prevails elsewhere—adoption of children can only be accomplished by appropriate writings made and recorded. Short of this, there is but the right of custody, together with such rights as may be incident thereto. Now, that a parent may confer upon some other person the legal right to the custody of his minor child, short of the execution of adoption papers, is settled by our former decisions. *Bonnett v. Bonnett,* 61 Iowa, 199; *Lally v. Fitz Henry,* 85 Iowa, 53. It will be presumed in all cases, however, that the surrender of custody is intended to be temporary, unless the contrary is made to appear by proof, clear, definite, and certain. *Drumb v. Keen,* 47 Iowa, 437.

It follows that if the evidence in the case before us fully establishes the fact that the custody of the minor plaintiff was given over by her father to the defendants without limitation or condition as to time, place, or circumstance, and the intent fairly inferable being to permanently divest himself of the right to resume custody in the future, or that by reason of the lapse of time and change of conditions, he ought not to be permitted to resume custody—saving consideration of a phase of the subject presently to be referred to—it should be said that the custody on the part of defendants, thus acquired, should not be interfered with. But while we accept the law to be as thus stated, we are unable to agree with the

learned counsel for appellants that the record warrants the conclusion contended for by them. To our minds, the proof of an absolute relinquishment of his rights on the part of James Murphy is not clear, definite, and certain. It may be conceded that in his distress, in the presence of his other helpless children, and in the presence of the dead wife and mother, he made some statements which make debate fairly possible; and that counsel have built up thereon a forceful and persuasive argument, we are frank to admit. As we think, however, it may fairly be doubted whether Murphy was in a condition of mind at the moment so that it can be said that he fully comprehended the force and effect of the statements attributed to him. Moreover, the conclusion that statements of the character shown, made under the circumstances shown, should not be accepted as proof conclusive of an intent on the part of Murphy to put away his child forever, is strengthened, if not altogether fortified, by his subsequent refusal to confirm a legal right in defendants by the execution of adoption papers. That the understanding and intent of the defendants in the premises should not be lost sight of is very true, but, even if we were satisfied that they came to the understanding that the right to permanent custody was given to them—a conclusion rendered doubtful by the uncontradicted statements made by Mrs. Miller respecting Murphy's refusal to execute adoption papers, and respecting the circumstances of their leaving Scotland—still a very familiar principle leads us to say that such understanding could not prevail unless there was a corresponding understanding on the part of Murphy, and this so clearly made out that it ought to be enforced against him. As already stated, this does not appear.

In this connection, we may take note of a further ground of defense set up by defendants. An act of the Parliament of Great Britain entitled "The Custody of Children Act 1891" was pleaded in the answer, and proof of such act was made upon the trial. As far as material to be considered, the act provides

2. HABEAS corpus; compensation for care of child.

that where the parent of a child applies for a writ or order for the production of such child, and the court is of the opinion that the parent has abandoned or deserted the child, or has otherwise so conducted himself that his request should be refused, the court may decline to issue the writ or make the order. If the child is being brought up by another person, and the court orders such child to be given up to its parent, it may, in its discretion, further order that the parent shall pay the costs incurred in bringing up the child. Based upon the provisions of such act, and upon the allegation that the cost of the care, custody, and keeping of the minor plaintiff has been the sum of $600, defendants ask judgment for said sum in the event their custody is terminated by order of the court. The subject-matter of this division of the answer was disregarded by the trial court, and we think properly so. Without touching upon any other reason, it will be sufficient for us to state that there is nothing in the record from which the conclusion can be drawn that the father had abandoned or deserted his child, or that he had been guilty, in any sense, of misconduct, within the meaning of the act in question. In the absence of the conditions upon which alone the act authorizes relief to be granted, we can have no basis from which to take further note of the claim as thus made by the defendants.

We may now consider whether the fact situation in which we find these parties presents any reason why the order appealed from should not have been made. It is sometimes said in cases involving the custody of children that the best interests of the child should always be accepted as the matter of controlling importance. Rightly understood, this is no doubt true. But the question is a relative one, always, and it can never be wholly divorced from the question of the rights and interests of parents, or those standing in *loco parentis,* when such are presented for consideration. Here each of the parties contending for custody is related by ties of blood to the child in question. That natural affection for the

3. HABEAS corpus: adoption evidence.

child on the part of defendants has been intensified by asso·
ciation, we cannot doubt. That the parents by adoption are
actuated by pure motives, seated in affection and solicitude
for the future welfare of the child, we cannot doubt. Now,
as we have seen, in contemplation of law, the defendants never
had any right save that of temporary custody. The parents
by adoption have every legal right formerly possessed by the
natural parents. The child itself is not old enough so that
we can have manifestation of wish or desire upon its part.
The defendants are respectable people, moral and upright,
but, financially speaking, are now, and at all times have been,
in extremely straitened circumstances. Although the fu-
ture promises better things for him, yet during the year pre-
ceding the trial the gross earnings of the defendant Thomas
Miller had been less than $100. The adopted parents are
worthy in all respects, and are possessed of a financial com-·
petency. It may be added that neither of the contending
parties have any children of their own. Taking into view
the entire situation, we cannot say that the trial court erred
in finding that the best interests of the child required that
the custody thereof be given over to its parents by adoption.
Thereby it was made certain that the child will have at the
hands of those who are legally bound for its support, and
whose heir at law it may become, a good home and careful
and conscientious training. Under the circumstances of this
case, and without undertaking to lay down a rule by which
cases presenting a variant state of facts are to be determined,
we agree that had the father of the child presented himself,
demanding custody, the showing of affection for the child
here made by defendants would not have sufficed as an an-
swer to his demand. Less persuasive, of course, is the appeal
for custody on the part of the parents by adoption; but we
are also led to agree that the showing of affection on the part
of defendants is not such that of itself it ought to be per-
mitted to outweigh all the other considerations which the
record presents, especially as the whole future of the child is
hanging in the balance.

II.   We may now consider the ruling upon the motion for new trial as made by defendants.   Waiving the question of form in which the motion is presented, there is but one

**4. JUDGMENTS:** matter involved therein which challenges atten-
consideration tion and demands discussion at our hands.   At
of matters
outside the the conclusion of the hearing, the trial court
record; new
trial. announced in an opinion that, as then advised,

the best interests of the child did not require a change of custody, but that no order would then be made, in view of the then present critical condition of defendants' financial affairs. Following this, plaintiffs made application to the court to set aside the submission of the cause, and permit the introduction of further evidence on their behalf.   This application was supported by affidavits on the part of James Murphy and others, asserting, in substance, that the mother of the minor plaintiff never expressed a wish that she (plaintiff) be given to defendants; that in fact no more than mere temporary custody of plaintiff was ever given to defendants, and that payment for her clothes and keeping was made by the father to defendants; that the father persistently refused to grant to defendants any rights save that of temporary custody; and that the removal of the child to this country was wholly unauthorized and wrongful.   This application, upon hearing, was overruled.   At the time, however, the court announced that upon further consideration the conclusion had been reached that the best interests of the child demanded that it be given into the custody of its parents by adoption, and an order to that effect was then made and entered accordingly. What was said by the court on each occasion was taken down, and is incorporated in the record.   It does not appear from the remarks made on the occasion of the final order that the same was predicated upon anything save such matters as were fairly disclosed by the record.   This far, at least, we are bound to presume that only such matters as were proper to be considered were in fact considered.   It appears, however— and herein lies the matter of contention—that pending the motion for new trial the court signed what is denominated a

"partial bill of exceptions." Therein is recited the submis-
sion of the case to the court; the first announcement as made
by the court; the subsequent application to set aside the sub-
mission, and the ruling thereon; then "that thereafter, upon
further consideration of all the evidence and facts shown,
*and all other matters coming to the knowledge of the court,*
the court came to the conclusion," etc. The italics are ours.
It is now urged—and this in language most courteous, and
with evident respect for the learned trial judge, now deceased
—that the italicised expression in the bill of exceptions
clearly indicates that considerations not of record were per-
mitted to enter into the judgment. To this conclusion we
cannot yield our assent. Just what, within the possibilities,
lay behind the expression as used, we do not know; nor is
there anything in the record, outside of the words themselves,
to indicate. It may be that some matter not strictly within
the written record was permitted to enter into the considera-
tion of the court. Conceding this, it may be said that there
is a wide range of matters incident to common knowledge of
which courts properly take notice, no formal proof thereof
being required. If such were the matters referred to in the
bill, there would be no ground for criticism. Be this as it
may, however, to impeach the order made, we must assume
not only that improper matters were considered, but that such
constituted material grounds upon which the court moved to
judgment. Certainly we must decline to disturb an order
in the nature of final judgment because an expression found
in the record suggests the inference, or even makes it certain
that some matters, unknown in character and importance,
not formally made a part of the record, had influence in de-
termining the judgment of the court; and especially must this
be true when, as in the instant case, the record, as written,
satisfies us that the order was warranted and proper. Still
another reason for the conclusion reached by us is to be found
in the fact that the motion of defendants for a new trial was
not heard and determined for some days after the bill of ex-
ceptions was signed. We will presume that the expression

in the bill was called to the attention of the court, and that, had such expression been significant of any impropriety entering into the judgment, corrective steps would have been ordered taken at once.

It is our conclusion upon the whole case that the order and judgment were warranted, and should not, therefore, be disturbed.—AFFIRMED.