## JAMISON v. GILBERT *et ux.*

No. 4784.   Opinion Filed September 9, 1913.

(135 Pac. 342.)

1.   **HABEAS CORPUS—Appellate Jurisdiction—Custody of Minor.**
This court has jurisdiction on appeal to review an order of the district court awarding the custody of a minor child to one of the parties in a habeas corpus proceeding, brought for the purpose of determining who has the right to the custody and control of such minor.

2.   **SAME—Custody of Child—Unfitness of Parent.**   The unfitness which will deprive a parent of the right to the custody of his minor child must be positive and not comparative; and the mere fact that his minor child might be better cared for by

a third person is not sufficient to deprive the parent of his right to its custody.

3. **SAME.** It is not sufficient, to establish the unfitness of a parent for the custody and control of his minor child, to show that he has some faults of character or bad habits; it must be shown that his condition in life or his character and habits are such that provision for the child's ordinary comfort and contentment, or for its intellectual and moral development, cannot be reasonably expected at the parent's hands.

(Syllabus by the Court.)

*Error from District Court, Atoka County;*
*Robert M. Rainey, Judge.*

Application for writ of *habeas corpus* by Luther Jamison against A. W. Gilbert and Dilly Gilbert. Judgment for defendants, and plaintiff brings error. Reversed and remanded, with directions.

This action is for writ of *habeas corpus,* brought in the court below by Willie Green Jamison, an infant, acting by and through his father, against defendants in error, who are the maternal grandparents of said infant, to determine the right to the custody and control of said child. There were two hearings upon the petition in the court below. At the conclusion of the first hearing, the court refused to grant the writ, and awarded the custody of the child to defendants in error, who had theretofore been in possession of him, but granted leave to the plaintiff in error to reopen the case at a later time, which was done. At the second hearing, the trial court found that when the said Willie Green Jamison was a very small child, he was given by his father, plaintiff in error, to the child's grandparents on his mother's side, defendants in error; and that since said time said child has been in the custody and control of defendants in error; that they have properly clothed and fed him, and given him good training; that after the plaintiff in error placed the child in possession of his grandparents, he married a second time and is now the head of a family and has living with him a son, the brother

of the child in controversy, and two children, the fruits of his second marriage; that during the time the child was in the possession of his grandparents, plaintiff in error contributed practically nothing toward its support; and he further found that defendants in error have in all things looked after the best interests of the child, and that they are in a better position to look after his welfare than is plaintiff in error, his father. Upon these findings of fact, the court made an order denying the writ and awarding the custody and care of the child to defendants in error. To reverse this order, this proceeding in error is prosecuted.

*Charles E. McPherren, Charles B. Cochran,* and *Charles P. Abbott,* for plaintiff in error.

*J. W. Clark* and *Gray & McVay,* for defendants in error.

HAYES, C. J. (after stating the facts as above.) The first question presented by this proceeding is whether the order sought to be reversed is an appealable order. It has been decided several times in this jurisdiction that from an order in a *habeas corpus* proceeding, brought by a party imprisoned or restrained of his liberty, no appeal lies to this court. *Wisener v. Burrell,* 28 Okla. 546, 118 Pac. 999, 34 L. R. A. (N. S.) 755, Ann. Cas. 1912D, 356; *Williams v. Sale et al.,* 33 Okla. 659, 126 Pac. 800; *Ex parte Johnson,* 1 Okla. Cr. 414, 98 Pac. 461.

In adopting the rule announced in the foregoing cases, the court recognized the sharp conflict among the authorities upon the question, but adopted the rule that in a proceeding for *habeas corpus,* brought by a person to release him from restraint, where he is held under some purported criminal charge, the order of the court releasing or remanding the prisoner is not such an order as to constitute a final order from which an appeal may be taken under statutes similar to the one in this jurisdiction, granting appeals from the final order or judgment in a cause. The rule adopted by this

court in those cases is based upon the ·reason that in such proceedings for *habeas corpus,* a decision therein is not *res adjudicata;* but an examination of the authorities convinces us that the weight of authority holds that there is a distinction between a *habeas corpus* proceeding brought to secure the release of a person from restraint and a similar proceeding instituted to determine the right to the custody of children. In the former class of cases, a decision on one writ is not a bar to the issuance of and proceedings upon a second writ; but an order in a proceeding to determine the right to the custody of a child, where the facts in the proceeding are the same as the first, is *res adjudicata.* The rule has been stated by one court as follows:

"In a proceeding for *habeas corpus,* where controversy arises over the custody of a child, the real issue is one between private parties, contesting the question of private rights, in which there arises no question of a personal liberty, and in consequence all matters in issue arising upon the same state of facts determined in a prior proceeding, should be regarded as settled and concluded. However, where many facts appear to be presented by the record which may not have been presented to the judge at the former hearing, and where possibly other facts have occurred since the former hearing, this court will examine the entire matter." (*In re Hamilton,* 66 Kan. 754, 71 Pac. 817; *Blakley v. Barclay,* 75 Kan. 462, 89 Pac. 906, 10 L. R. A. [N. S.] 230.)

It follows as a result of such a rule that since the judgment rendered upon the facts existing at the time of the trial is binding and conclusive and bars a subsequent proceeding by the parties thereto upon the same facts, the order made thereon is a final order, so far as the facts existing at the time of the institution of the case and trial are involved; and such an order is final, within the meaning of the statutes, for the purpose of review. *Bleakley v. Smart,* 74 Kan. 476, 87 Pac. 76, 11 Ann. Cas. 125; *Cormack v. Marshall,* 211 Ill. 519, 71 N. E. 1077, 67 L. R. A. 787, 1 Ann. Cas. 256; *Hall v. Whipple* (Tex. Civ. App.) 145 S. W. 308.

The grounds upon which a reversal of the judgment of the trial court is urged are that the judgment is not supported by the evidence and is contrary to the law. If the trial court meant by finding that plaintiff in error had given his child to the defendants in error to find thereby that he contracted with them to surrender or transfer the custody or control of his child to them permanently, we think there is merit in the contention that the finding of the trial court is not supported by the evidence. There is by no means harmony among the authorities as to whether such a contract is valid. Many of the courts declare such contract void as being against public policy. That question is not presented here. In those jurisdictions where such contracts are sustained, the rule is that a parent will not be held to have surrendered the custody and control of his child permanently to a stranger, unless it clearly appears that such was his intention; and it will be presumed that the surrender of the custody of the child by his parent is intended to be temporary, unless the contrary clearly appears. 29 Cyc. 1593. It is not sufficient that the person having temporary custody of the child understood that the parent had granted to him permanent custody; but it must be clear that there was a corresponding understanding on the part of the parent. *Miller v. Miller,* 123 Iowa, 165, 98 N. W. 631.

The evidence in this case establishes that plaintiff in error's first wife died when the child in controversy was about eight months old; that he also had another child by his deceased wife, about three years old. After the death of the mother of said children, they were kept by the mother of plaintiff in error in Texas, and cared for for a period of about one year, after which time the plaintiff in error's mother became so weak that she was unable to care for the children, and they were returned to plaintiff in error. Upon the advice of plaintiff in error's mother, and with the consent of defendants in error, the younger child was left with defendants in error to care for. At the time he was turned over to them

by plaintiff in error, he stated that he could not care for it, and asked them to raise the child. Plaintiff in error lived 30 or 40 miles from the residence of defendants in error. He visited the child while it was with its grandparents once or twice a year, and during the time it was with them contributed about $12 toward its support. The remainder of the expenses of its support was paid for by the grandparents. Some few months after the second marriage of plaintiff in error, he went after the child and took it to his home, where it was kept for a time, and thereupon was permitted to visit its grandparents, the defendants in error. When plaintiff in error went to get the child at the end of this visit, the grandparents refused to permit him to take it and ordered him out of the house. He thereafter secretly obtained possession of the child and carried it to his home, where it remained for some time. He again consented to its visiting its grandparents, upon the assurance that the child would be permitted to return to its home, and the child was so permitted to return, where, after a time, it was again permitted to visit the grandparents, who have since said time refused to surrender it to plaintiff in error.

The foregoing constitutes in substance all the evidence relative to any contract on the part of the father surrendering the permanent custody and control of the child; and, in our opinion, it falls short of establishing clearly any agreement on his part that the grandparents should have the permanent custody of it. The trial court seems to have been controlled in his judgment principally by the impression that the child should be awarded to the party who was most able to provide for and care for it. A general rule of law, often stated in the cases, is that the welfare of the child is the paramount consideration in determining who shall have its possession; but this broad statement usually occurs in cases where the controversy is between the mother and the father, and frequently in cases where the right of the parents against each other have been by statute made equal, and the custody of

the children is to be determined according to the exigencies of the particular case, without regard to the superior right of either parent. The rule of law, we think, applicable to this case is stated in 29 Cyc. 1590 in the following language:

"A parent who is of good character and a proper person to have the custody of the child, and reasonably able to provide for it, is entitled to the custody as against other persons, although such others are much attached to the child, and the child is attached to them, and prefers to remain with them, and they are in all respects suitable to have the custody of the child and able to support and care for it, and even though they are of larger fortune or able to provide for the child more comfortably than the parent, or to care for it better, or to give it a better education than the parent can afford."

In the case of *Norval v. Zinsmaster,* 57 Neb. 158, 77 N. W. 373, 73 Am. St. Rep. 500; it was said:

"We are aware that this court has several times asserted that in such controversies as the present the order should be made with sole reference to the best interests of the child. But this has been broad language, applied to special cases. The court has never deprived a parent of the custody of a child merely because of financial or other grounds a stranger might better provide. The statute declares and nature demands that the right shall be in the parent, unless the parent be affirmatively unfit. The statute does not make the judges the guardians of all the children in the state, with power to take them from their parents, so long as the latter discharge their duties to the best of their ability, and give them to strangers because such strangers may be better able to provide what is already well provided. If that were the law, it would be soon changed, by revolution, if necessary."

In another case from the same court it was held that the unfitness which deprived a parent of the right to the custody of the children must be positive and not comparative; and the mere fact that the children would be better nutured or cared for by a stranger is not sufficient to deprive the parent of his right to their custody. *Clarke v. Lyon et al.,* 82 Neb. 625, 119 N. W. 472, 20 L. R. A. (N. S.) 171.

However poor and unable a father may be, if of good moral character and able to support the child in his own style of life, he cannot be deprived of that privilege by any stranger, however brilliant the advantage he may offer. *Verser v. Ford,* 37 Ark. 27; *Hernandez et al. v. Thomas,* 50 Fla. 522, 39 South. 641, 2 L. R. A. (N. S.) 203, 111 Am. St. Rep. 137, 7 Ann. Cas. 446; *State of Louisiana ex rel. Delia Kearney v. Mrs. Andres Steele,* 121 La. 215, 46 South. 215, 16 L. R. A. (N. S.) 1004.

A great number of witnesses, including plaintiff in error's near neighbors, ministers and bankers, testified, on behalf of the father in this case, that he was a man of good moral character, a law-abiding citizen and highly respected by his neighbors. He is a farmer, and owns a farm of 80 acres, with a substantial residence thereon. He owns several teams of work horses, a few head of cattle, and hogs, has a small sum of money, and owes no debts. He has always taken care of his obligations promptly, and has always provided as well for his family as men of his circumstances are able to do. The evidence establishes that the other child of the first wife, who now lives with the father, is sent to school, and also to Sunday school, as much as it is convenient for him to go, living as he does some distance from the schoolhouse. Relative to the stepmother, the evidence establishes that she is an intelligent woman, of good character, respected by all her neighbors; that she is kind and considerate of her own children and of the children of plaintiff in error by his first wife; that she is impartial in her treatment of them; that she is willing to assist her husband in caring for and rearing said children. While there is no evidence reflecting upon the good character of defendants in error, all the evidence establishes that they have less financial means than plaintiff in error. They own no home and are tenants. They own but little personal property, consisting possibly of a team. The evidence also establishes that the grandfather has in the past had difficulty in meeting the obligations of his

own family; that during the recent years he has been sick a great part of the time, and is unable to labor and is dependent to a certain extent upon a grown son and another son almost grown for assistance to support his family.

An effort was made by defendants in error to establish that plaintiff in error is a dissipated man and possesses other immoral habits; but all the evidence in this respect is that sometimes plaintiff in error takes a drink of intoxicating liquors, which, according to his own testimony, occurs about Christmas time. All the testimony is to the effect that he never drinks to excess; and all his neighbors testified that he is an industrious man and good to his family. The evidence also establishes that he sometimes swears, and that he has in a few instances sworn in the presence of his family, and that he has played cards at his own home, but that he never gambles. The trial court does not find that the father is unfit to have the custody and care of his child, and upon the evidence before us, such a finding could not be sustained. The presumption is that the father is a suitable person to have the custody, care, and rearing of his child. Courts are reluctant to decree the separation of parent and child, and will do so only when the proof of a parent's unfitness is clear and convincing.

In *Ex parte Davidge*, 72 S. C. 16, 51 S. E. 269, it was said:

"To separate a child from its parent is, therefore, in a very strong measure, justified only by convincing proof of the parent's unfitness. No inflexible rule can be laid down by which unfitness may be determined. Each case must be decided on its own peculiar facts; but manifestly it is not sufficient to prove the poverty of the parent, and that financial benefit will come to the child from separation, or that the parent has faults of disposition and behavior somewhat unusual and trying. The condition in life, or the character and habits of the parent must be shown to be such that provision for the child's ordinary comfort and contentment, or for its intellectual and moral development, cannot be reasonably expected at his hands."

The few alleged faults of plaintiff in error, stated above and relied upon by defendants in error as establishing the unfitness of plaintiff in error, in our opinion, show no such deterioration of moral force and character as to render him an unsuitable person to have the custody of his child. Public opinion would be very largely divided upon whether taking a drink as seldom as the evidence establishes the father does in this case, or playing cards for amusement only, constitute any immorality whatever; and while the swearing by a parent in the presence of his family, even in moments of excitment or of anger, is a fault that cannot be commended by any one, that fault alone cannot be said, when accompanied by the many other virtues it is shown this father possesses, to so deprave his character as to render him an immoral man and an unsafe person to care for his child. The law does not require the parent to be perfect. Of the standard which the law fixes for the parent, it is said in *Lovell et ux. v. House of the Good Shepherd*, 9 Wash. 419, 37 Pac. 660, 43 Am. St. Rep. 839:

"There is such a diversity of religious and social opinion, and of social standing and of intellectual development and of moral responsibility in society at large that courts must exercise great charity and forbearance for the opinions, methods and practices of all different classes of society; and a case should be made out which is sufficiently extravagant and singular and wrong to meet the condemnation of all decent and law-abiding people, without regard to religious belief or social standing, before a parent should be deprived of the custody of a child."

*In re Crocheron's Estate,* 16 Idaho, 441, 101 Pac. 741, 33 L. R. A. (N. S.) 868, it was held that the mere fact that a father sometimes drank and at times became a little hilarious was not sufficient to render him unsuitable to act as guardian for his two minor children. Nor is proof that a father for a considerable period owed meat and grocery bills and for medical attendance and burial expenses of his deceased wife sufficient to deprive him of the right conferred by statute

to be appointed guardian of his children. *Re Galleher*, 2 Cal. App. 364, 84 Pac. 352.

If the right of the father in this case to the custody of his child was made to turn solely upon in whose hands the child will receive the best care and treatment, and upon where its welfare will be best promoted, the correctness of the decision of the learned trial court is very questionable. Both the child in controversy, who at the time was about six years of age, and his brother, who at the time was about nine years of age and who lives with his father, testified at the trial. The child in controversy testified that he preferred to live with his grandparents; that he did not want to live with his father; that he was a mean man, and that he did not love him. His brother testified that he was living with his father, his stepmother, and his little sister; that he preferred to live with his father; that his father was good to him, although he punished him when he did not obey. When asked relative to his grandparents, he said that he liked to visit his grandparents, and he loved them, but he preferred to live with his father.

Courts sometimes heed the expressed wish of an infant as to its custody; but the worthlessness of such an expression by a child of six years of age is clearly shown by this case. His aversion to his father is clearly the outgrowth of this contest between his father and his grandparents; and the enmity now in his heart against his natural parent has been instilled there for the purpose of affecting this case, rather than due to any judgment of the child as to the virtues of his father. No other explanation can be made of his feelings and statement, in view of the great number of neighbors of the father who testified as to his good character and of his kind treatment of his family. The grandparents are past middle life; and in the course of nature in all probability will die before this child is old enough to sustain himself; and in all probability, if left with his grandparents, in early youth he would find himself robbed of their care and attention by death; and at a time when the good counsel and restraint of parents are most

essential in his life, he would be without the love of a mother and without the counsel and restraint of a considerate father. There would be nothing, then, between him and complete orphanage, except a father from whom by that time he would be irrevocably estranged, and against whom his heart would be deeply embittered. Under such circumstances, it is of great importance to protect, as far as possible, the welfare and happiness of this child of tender years from the effect of loss of respect and affection for his father.

We can sympathize with the grandparents in their distress at the prospects of being separated from a child to whom they have become deeply attached because of natural ties and association, but sympathy cannot be permitted to enter into the determination of the rights of this father, whom the voice of nature makes the natural guardian of his child, or into the consideration of the permanent welfare of this child, who for many years yet must have a protector and a provider. These families, so far as this record appears, until this controversy arose, lived in peaceful relation to each other, and each entertained the highest respect and regard for the other. It is only since this contest arose that things derogatory to the good character of each have been sought and have been expressed. The aid defendants in error have rendered the father in caring for this child at a time when his circumstances were such that he was unable to give it personal attention is highly commendable, and may seem to them to merit their further custody and control of the child; but in calmer moments, when they have fully considered the matter and remember the love and affection for their own children and the pleasure and pride they took in rearing them, and realizing what a loss it would have been to them to have surrendered their own children to others permanently, we think they will then conclude that they should do as they would be done by, and be willing that this father should have given to him that which is his own.

The judgment of the trial court is reversed and the cause remanded, with directions to grant the writ and award the custody of the child to plaintiff in error.

All the Justices concur.