### Ex parte SPURRIER.
### SPURRIER v. SPURRIER et al.

Nos. 14559, 14838, 14839, Consolidated. —

Opinion Filed June 16, 1925.

Rehearing Denied Sept. 8, 1925.

**1. Guardian and Ward — Appointment of Guardian — Exclusive Jurisdiction of County Court — Injunction by District Court.**

County courts of this state have jurisdiction of guardianship matters and exclusive jurisdiction to pass upon the fitness and competency of the applicant for guardianship, and when a guardian is regularly and duly appointed and the appointment is not appealed from, the district court is without jurisdiction to enjoin such guardian from exercising the functions and performing the duties imposed upon him by virtue of his guardianship.

**2. Same—Habeas Corpus—Right of Guardian to Custody of Ward — Question of Fitness of Guardian.**

Where the duly appointed guardian files his application for a writ of habeas corpus to regain control of his wards, then exercised by a third party, and it appears from the pleadings and the evidence and the admission of respondent that the applicant for the writ is the legal and duly appointed and acting guardian, and his guardianship has not been terminated by order of the county court, majority of his ward, or marriage of the ward, the district court is without jurisdiction to hear and determine the fitness and competency of the guardian, and a denial of the writ upon such grounds is error.

**3. Same—Guardian not Allowed to Delegate Custody.**

When a county court has acquired jurisdiction of a minor child and appoints a guardian of its person and property, the minor becomes a charge of the state, and subject to the control of the court, and a guardian cannot delegate his powers of guardianship to another nor dispose of the custody and control of his ward by assignment without approval of the county court.

(Syllabus by Ruth, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Rogers County; C. H. Baskin Judge.

J. R. Spurrier, as father and legally appointed guardian of Alice F. Spurrier, Margaret L. Spurrier, and James R. Spurrier, sought to recover the custody of his children and wards then under the control of J. W. Spurrier and Mrs. J. W. Spurrier, father and mother, respectively, of J. R. Spurrier, and grandfather and grandmother, respectively, of the minor children. Writ of habeas corpus denied, and petitioner files his petition in error and case-made in this court. J. W. Spurrier filed his petition in the district court of Rogers county, praying that J. R. Spurrier be enjoined from coming on the premises occupied by J. W. Spurrier and the minor children. Injunction awarded, and J. R. Spurrier appeals. Reversed and remanded, with directions. Thereafter, J. R. Spurrier filed his original petition in this court against J. W. Spurrier and Mrs. J. W. Spurrier, praying a writ of habeas corpus, to gain custody and control of the minor children. Writ awarded, and appealed causes reversed and remanded, with directions.

Hunter L. Johnson and E. A. Threadgill, for J. R. Spurrier.

Freeling, Hood & Howard, for respondents and defendants in error.

Opinion by RUTH, C. These three causes of action grew out of an effort on the part of John R. Spurrier to gain control of his minor children and an effort on the part of J. W. Spurrier and Mrs. J. W. Spurrier, father and mother of John R. Spurrier, to retain custody and control of the minors, their grandchildren.

On June 5, 1923, J. W. Spurrier filed his petition in the district court of Rogers coun-

ty, against John R. Spurrier, and alleged that plaintiff is in lawful custody of the minors by agreement with the defendant and has had the custody of the minor children, to wit, Alice F. Spurrier, aged 8 years, Margaret Spurrier, aged 6 years, and James R. Spurrier, aged 5 years, for four and one-half years and defendant by force, threats, and intimidation, seeks to take possession, custody and control of the minors, and prays that defendant be enjoined from molesting and disturbing the plaintiff in his lawful and peaceful possession of the minor children.

The court granted a temporary restraining order, and defendant filed his motion to dissolve the same, alleging that he was the only surviving parent of the children, and was by the county court of Osage county duly appointed the guardian of the persons and property of the minor children, and attached copies of the proceedings of his appointment. Defendant further alleged plaintiffs were preparing to take the children outside the jurisdiction of the court. The court thereupon made an order restraining plaintiffs from removing the minors from the jurisdiction of the court, and on June 8, 1923, John R. Spurrier filed in the district court his petition for a writ of habeas corpus, alleging the grandparents unlawfully held the minor children and setting up his paternity and guardianship; that for the four and one-half years the minors had been with J. W. and Mrs. J. W. Spurrier, he, the father, had paid $150 per month to the grandparents for the maintenance of the children, and now he had a home and prayed the children be restored to him. The causes were consolidated in the district court, and it was stipulated the testimony be considered as the testimony in the injunction suit. The court denied the writ of habeas corpus to John R. and granted a permanent injunction to J. W. Spurrier, and enjoined John R. from going upon J. W.'s premises or interfering with his custody of the children, and John R. filed notice of appeal. John R. Spurrier thereafter, and on July 24, 1923, filed his original petition for a writ of habeas corpus in this court against J. W. and Mrs. J. W. Spurrier, and this court, upon assuming jurisdiction of the case, continued it indefinitely, pending the filing of the records in the two cases from Rogers county, and on November 27, 1923, this court ordered the three causes consolidated and the order provided the parties should brief the three causes in cause No. 14559, the briefs to be considered as filed in, and applicable to, all three cases, the three cases to be heard, considered, and decided together.

The only question to be decided in these three cases is, "Is John R. Spurrier, the surviving parent and the duly appointed legal guardian of the persons and estates of the minor children, entitled to the custody of his children and wards, as against J. W. Spurrier and Mrs. J. W. Spurrier, parents of John R. Spurrier, and grandparents of the minor children"?

Throughout this opinion John R. will be designated as "petitioner" and J. W. and Mrs. J. W. Spurrier will be called "respondents."

We have carefully read and considered the briefs and all the records in these cases, and find as follows: Petitioner and his wife, who was the mother of the minors, lived at Bigheart, Okla., and petitioner was called to the U. S. service and stationed at Ft. Sill, Okla., where his wife joined him, and upon the death of a brother-in-law, the petitioner obtained a furlough, and with his wife returned to Osage county, and when he returned to camp, his wife did not accompany him. He was discharged on December 25, 1918, after the armistice was signed, and returned to Bigheart suffering from the "flu," but did not find his wife there, but learning her whereabouts and that she was ill, immediately went to her bedside, and petitioner's wife died December 28, 1918, and he requested respondents to take care of the children until he could provide a home for them, and agreed to pay respondents $25 per month each for the care of the children. This continued for one year, when respondents told petitioner, "We are due $150 a month for taking care of these children, for their maintenance and for services and looking after them, and I want it." (This was the testimony of the grandfather.) Thereupon, the petitioner gave his personal check for $900 to the respondent, and ever after or for three and a half years paid the respondents $150 per month for the care of the minors, notwithstanding respondents testified they were living in the minors' home an eight-room house, and farmed 80 acres of the minors' land and paid no rent, "but just made their home there."

Respondent claimed a one-fourth interest in the house as against the minors' three-fourths interest, and when asked if he owned a one-fourth interest, he made evasive replies, such as "Well, I got a deed for it," and when required to answer direct, he said, "Yes, I own it." Subsequently, six checks were introduced showing the petitioner had

purchased respondents' interest for the minors, the checks reciting on their face "For 1-4 interest in Claremore house." These checks were made payable to J. W. Spurrier, and signed by John R. Spurrier, as guardian, and indorsed by J. W. Spurrier, and the testimony of respondents does not impress this court very favorably.

Petitioner is engaged in business as an oil operator, and has an income of $4,000 per annum from the U. S. government apart from his business income, and the minors have an income from the U. S. government of $2,000 each per annum, and the respondent testifies he has an income of but $700 or $800 per year, and as he receives $1,800 per year for the care of the children and has 80 acres and a house, belonging to the minors, we might indulge a surmise as to why he is so anxious to retain the custody of them. Through all these cases respondents charge their 30 year old son, the petitioner, with being a drunkard, with brutality, with embezzlement of the minors' funds, and with immorality.

Twenty-five witnesses were sworn and testified for either side. Bankers, lawyers, doctors, merchants, real estate dealers, and oil operators testified they had known petitioner for periods ranging from three months to ten years, and had never seen him drunk, or never saw him take a drink, and it is safe to assume that in a town the size of Bigheart, if petitioner had been the "village drunkard," it would not have been a hard task to prove the same.

Steen Spurrier, aged 27, brother of petitioner, called for respondents, testified that John R. had told him (Steen) that he had taken two drinks in the Mid-Con. office, two drinks at a restaurant, or at his hotel, and one drink of port wine at Shreveport, La., and that whisky made him deathly sick. Steen further testified he never saw petitioner take a drink of liquor, but when he called petitioner, the night he was at the Mid-Con. office, petitioner's voice over the phone was not in his opinion "normal." One of the witnesses who was present at the Mid-Con. offices on that occasion testified the "boys were drinking a little and kept 'kidding' John (the petitioner) because he would not drink and finally John took a couple of drinks that made him very sick, but he was not drunk." Another witness for respondents testified he did not know petitioner, but about four weeks prior to the trial he saw a man, who he afterwards learned was petitioner, in a restaurant, in an intoxicated condition; at least he judged

he was intoxicated because he was talking loud, but was not disturbing anyone. (This was the night petitioner said he took two drinks.) This was the full extent of the testimony of petitioner's drunkenness, and we are not prepared to say that a man who has never taken but four drinks of whisky and one drink of port wine in 30 years, and these taken some weeks apart, is a confirmed drunkard.

As to the brutality of petitioner, respondents testified petitioner visited his children every two or three weeks. That on one occasion Buster (J. R. Spurrier, Jr.) was tearing the paper off the wall and his father (petitioner) "spanked" him for it. On another occasion Buster was running about the house and would not take the medicine his grandmother sought to administer and petitioner said, "Give it to me and I will make him take it," and Buster refused to take it, and petitioner spanked him, and he took his medicine. On another occasion, Buster, sitting beside his father, petitioner, at the table, began to cry and petitioner took him on his lap, and said "Stop it," but did not make any effort to spank him. The grandfather admits he, respondent, was excited and took Buster from his father's lap and said, "Let him alone, we'll attend to these children." This is the sum total of the testimony relating to the brutality of petitioner, two spankings in four and one-half years.

Dr. Simms, called for respondents, in response to a question as to whether he had knowledge of trouble at the Spurrier home, stated that on one occasion when the doctor was at Col. Barrett's house, one-quarter of a mile from the Spurrier home, he heard a terrible screaming coming from the Spurrier residence, and being their attending physician and fearing his services might be needed, called the Spurriers over Col. Barrett's phone and learned it was Buster screaming in protest over his grandmother's attempting to give him a bath, and we are inclined to the belief that had Buster received a few more than two spankings in four and one-half years, he would not have aroused the neighbors within a radius of a quarter of a mile with his screams of protest over taking medicine and baths. If two spankings in four and one-half years constitute such brutality as to warrant taking children from their father and legal guardian, and placing the "spankee" in the custody of the grandparents, a large portion of our citizenry would never have been raised by their parents.

Two years after the death of the mother of the minors, petitioner married, but as the second wife was not of the same religious faith as respondents, they refused to have anything to do with her, and when petitioner sent his mother a telegram and ordered flowers for her, on Mother's Day, petitioner's mother wrote him a very discourteous letter, saying his wife sent them and she did not want anything from that woman. The parents of the bride and groom' got at "outs", and the discord and strife between the two families finally reached the hearthstone of petitioner, and it culminated in petitioner's wife saying she wanted a divorce. (She was about 18 years of age at the time and petitioner was 27). He agreed that if she really wanted a divorce he would not oppose it. The petition filed contained the usual allegations of abuse, cruelty, threatening to strike her, and to kill her, but there was no allegation that petitioner ever actually struck his wife. Before the expiration of the six months' probationary period had expired, petitioner and his wife decided to live their own lives regardless of their repective parents, and they went into court, had the divorce proceedings annulled, were reunited, and "lived happily ever after," and this divorce petition is used in those cases as evidence of petitioner's brutal nature.

There was no evidence offered to prove petitioner did not properly handle the minor children's estate, unless it was the fact that he was so liberal with the respondents, for their care of the children. He does not appear to have disbursed one dollar of their estate without an order of the county court of Osage county. His reports were promptly filed and approved by the court.

To sustain the charges of immorality, and in an effort to convince the court the petitioner was a libertine, a rake, a debauchee, and roue, the respondent, J. W. Spurrier, testified that while petitioner was unmarried, and was ill in bed at the Mason Hotel, he went to see his son, and walked in the room and found a "chippie" in bed with petitioner. No effort was made to prove the woman a prostitute, except the statement of the father, and petitioner testified that he had been injured by a horse in Shreveport, La. and was confined to his bed for a week, and while the nature of his injury is not disclosed, it was such as required the constant attention of a nurse, and his physical condition precluded any act of immorality, and when his father entered the room (the door not being closed or locked) the nurse was lying (across) the bed resting. All through the record there is a determined

effort on the part of the respondents and the two younger sons to tear down the reputation or character of the petitioner, to the end that the children remain with respondents, who appear to be living at the expense of the minors. Respondents say petitioner can come and live with the children, and "they will treat him as they always did, provided he will go back to wearing knee pants." The mother testifies that "John done her dirty," but the only mistreatment was the fact that he filed a petition for a writ of habeas corpus.

It appears respondents fled to Arkansas. taking the children with them, and J. W. Spurrier wrote petitioner a letter from Fort Smith on August 14, 1923, after these suits were filed, in which letter he calls petitioner's lawyers "jacklegs," and with reference to one of them he writes:

"If I were to select the dirtiest unmitigated scoundrel at the Osage bar, I would not pass him up."

Again, in speaking of the court he says:

"That thing was a joke as a lawyer, and now a travesty as a judge, and in the hands of that juggler, is as clay in the hands of the potter. He is to Osage county what Manuel Herrick was to Congress, an absolute burlesque and a joke, * * * and all of them put together have not as much legal sense as an ordinary justice of the peace, and I advise you and your bunch of crooks and that excuse of a judge you will never get these children. * * * I have no respect for him as a man and the contempt I have for his ignorance would not look well in print. And as far as the court is concerned and the bunch of hangers-on, they can go straight to sheol (hell) as far as I am interested. Now the sum total is this: that we are out of Osage county, out of the state, and out of reach of any court, and little are we concerned what the decision may be * * * So your lawyers have lawed you out of money and lawed you out of your kids, and now you will have to come to me for relief."

Respondents also threaten petitioner with the penitentiary and the "crazy house." This letter was written while these three cases were pending. We here find the respondent, a man 66 years of age, desiring to raise three very young children, and practically living off the income of the children. A man who has no regard for the truth even when testifying under oath, as evidenced by his testimony respecting his ownership of a one-fourth interest in the childrens' home. A man who has no respect for members of the legal profession; a man who would tear down the character of his own son to serve his ends. A man who would

tear down the reputation of a woman and call her a prostitute, and not attempt to prove it save by his mere expression of opinion, and a man who says the courts can go straight to hell—as far as he is interested, as he is out of reach of any court and is not concerned what the decision may be. In view of his attitude, we do not feel inclined to devote much space to the citation of statutes and authorities to sustain our decision to reverse the judgment of the district court in granting the injunction and remanding that cause, with instructions to dissolve the injunction and dismiss the cause, nor to reverse the judgment of the district court in refusing to award the writ of habeas corpus with directions.

In response to the original petition filed in this court, it is admitted that petitioner is the father and duly appointed guardian of the minor children, and it follows then that:

"The record thereof being regular on its face, presumption is that all facts necessary to vest court with jurisdiction, including qualifications of guardian, exist." Johnson v. Johnson, 60 Okla. 206, 159 Pac. 1121.

Father in no way incompetent is entitled to guardianship of minor children. Section 1441, C. O. S. 1921; Coats v. Benton, 80 Okla. 93, 194 Pac. 198.

Section 1442, C. O. S. 1921, provides that the guardian shall have the care and custody of the minor. Section 1491, C. O. S. 1921, provides for the removal of the guardian for causes named therein, and respondents availed themselves of this statute, but were unsuccessful in having the guardian removed, and his competency was reestablished. Section 6587, C. O. S. 1921, provides that the guardian is charged with the custody of the ward and must look to his support, health and education. He may fix the residence of the ward at any place within the state.

How may a guardian, whose competency is thoroughly established in the court having jurisdiction over his appointment and removal, perform the duties imposed upon him, if the district court of another county may enjoin him from performing those duties, and cite him for contempt when he attempts to perform them? They have him between the upper and nether millstones. If he does not perform his duties, he is removed. If he does perform his duties, he goes to jail for contempt of court. He is between the devil and the deep blue sea. If he goes the one way, he is drowned. If he goes the other, he is damned.

"A guardian appointed by a court has power over the person and property of the ward unless otherwise ordered, and such power is suspended only by order of the court, etc." Kersely v. McDougal, 79 Okla. 53, 191 Pac. 594.

It therefore follows that if the county court is vested with exclusive jurisdiction to appoint and remove guardians, the district court is without power to remove the wards from the custody of the guardian or to enjoin such guardian from performing his duties under the order of appointment. In such a case the equity jurisdiction of the district court may only be invoked in **aid** of the county court and not in opposition thereto. True it may be, that the district court in a proper case might enjoin a guardian from doing certain acts in violation of his guardianship duties until such time as the jurisdiction of the county court could be invoked for the guardian's removal.

In 29 Corpus Juris, 113, section 108, the general rule is laid down as follows:

"If proceedings, other than habeas corpus affecting the custody of an infant, were such as to give the court jurisdiction to make a valid order and judgment for its custody, such judgment would be regarded as final, upon the facts as they then existed, appealable, but not subject to attack, by habeas corpus. * * * An order appointing guardian for an infant, is to be deemed valid, and is conclusive of the right of such guardian to the infant's custody, until reversed by a direct proceeding, and it cannot be assailed in a collateral way by habeas corpus proceedings."

In 29 C. J. 116, sec. 112, it is said:

"Pursuant to a general rule of wide application, and upon which there is no conflict of authorities, it has been held that a court is without jurisdiction where it attempts by habeas corpus to interfere with the exercise by another court of jurisdiction theretofore acquired. Ex parte Miller (Cal.) 42 Pac. 428; In re Get Young, 90 Cal. 77, 27 Pac. 158.

In Re Lundberg (Cal.) 77 Pac. 156, the court held:

"It has long been the settled practice to determine in the guardianship proceedings, questions as to the fitness and competency of parents to have the custody of their children."

And in Ex parte Mathews (Cal.) 167 Pac. 873, the court relegated the parties to a reliance upon and obedience to the order of the probate court appointing a guardian.

Herndon v. Bonner (Miss.) 52 South. 513, and Cottrell v. Booth (Ind.) 76 N. E. 546, are directly in point, and in the latter case the court said:

"Under the statutes above cited, it is plain that in this case the right to the custody of the children is an incident to the office of guardianship; that this right may be enforced by habeas corpus; and that the initial step which respondents should take, if the state of facts alleged by them in their return is true and they desire the custody of said wards, is to make an application under section 2688 for the removal of the guardian." See Board v. Shutter, 139 Ind. 268; Ferguson v. Ferguson, 36 Mo. 197.

In State ex rel. v. Landis (Mo.) 158 S. W. 883, a habeas corpus proceeding was pending in the Court of Appeals, and a party to the cause obtained the appointment of a guardian. The Court of Appeals retained jurisdiction of the habeas corpus on the ground that it had first obtained jurisdiction to determine the custody of the children and the court said:

"The law is well established that where one court has lawfully assumed jurisdiction over a given case, other courts of concurrent jurisdiction in that matter must pursue the salutary and practical policy of 'hands off'."

Judge Lamm in State ex rel. Mo. Pac. Ry. Co. v. Williams, 221 Mo. loc. ct. 268, said:

"To be respected, courts must respect each other. * * * No two courts may proceed on contrary theories at the same time.

See In re Kol (N. D.) 88 N. W. 273; Mathews v. Wade, 2 W. Va. 464; McLain v. Brewington et al. (Ark.) 211 S. W. 174; People v. Wilcox, 22 Barb. (N. Y.) 178; Ex parte Grimes (Tex.) 216 S. W. 251; Burus v. Shapley (Ala.) 77 South. 447; Fitts v. Fitts, 21 Tex. 511.

The court in Ex parte Crist (Ohio) 105 N. E. 71, in discussing a decree awarding the custody of the children, said:

"Nor does any other court by a proceeding, acquire any jurisdiction further than to enforce the decree so rendered. * * * An answer to a writ of habeas corpus, issued upon application of the person to whom such custody and control was committed, by the common pleas court, averring that the applicant is not a proper or suitable person to have the custody and control of such children, confers upon the court issuing the writ no jurisdiction to hear and determine that question" Hoffman v. Hoffman, 15 Ohio St. 427; Rogers v. Rogers, 51 Ohio St. 1, 36 N. E. 310; In re Morgan (Mo.) 21 S. W. 1122, 22 S. W. 913; State ex rel. v. Buckner (Mo.) 200 S. W. 94.

"Habeas Corpus cannot be used to determine the right of guardianship." 15 Am. & Eng. Encyc. Law, 156 (2nd Ed.)

Section 444, Comp. St. 1921 expressly confers upon the guardian the right to ask for a writ of habeas corpus. The rule seems to be universal, and it were idle to pursue the inquiry further. Upon a showing that the petitioner had been duly appointed the legal guardian and his competency established in a court of competent jurisdiction, the district court acquired no jurisdiction in the injunction proceedings to enjoin petitioner from exercising his rights or performing the duties imposed upon him by reason of his guardianship, and the issuance of such injunction was error.

The contention by respondents that the petitioner had said he would never take the children away from respondents is without merit. The evidence shows respondents were very liberally compensated for their care of the children, until such time as the petitioner could provide a home for them with him. Nor could the legal guardian give the minor children to any person. When the county court acquired jurisdiction and appointed a guardian, the guardian became an officer of the court, with certain duties impressed upon his office, and the minors became wards of the state and under control of its courts. The guardian could not delegate his powers or duties, nor divest himself of his responsibilities, without an order of the court. The court could order the guardian to remove the wards from the custody and control of the respondents or any other person, to whom such custody had been committed, if such removal was for the best interest of the wards, and upon failure to comply with such order, the court might remove the guardian.

28 Corpus Juris, 1111, states the rule thus:

"Inasmuch as a guardianship is a purely personal trust, the guardianship of an infant person is not assignable."

In re Cross (Butler), 41 Okla. 629, 131 Pac. 673, this court said:

"The testimony shows that Mrs. Cross, the wife of the defendant in error, undertook the care of the child for hire. * * * This clearly refutes the idea of abandonment, or any intention on the part of the mother to relinquish or abandon her natural right to the care and custody of her child."

In Jamison v. Gilbert, 38 Okla. 751, 135 Pac. 342, this court at p. 855 says:

"It is not sufficient that the person having temporary custody of the child understood that the parent had granted to him permanent custody; but it must be clear that there was a corresponding understanding on the part of the parent." 29 Cyc. 1593; Miller v. Miller, 123 Iowa, 165, 98 N. W. 631.

For errors appearing in the record as herein indicated, the judgment of the district court of Rogers county should be reversed and remanded, with instructions to grant the writ of habeas corpus as prayed by petitioner, and restore the custody of the wards to John R. Spurrier, and with further instructions to the district court to dissolve the permanent injunction heretofore granted upon the prayer of J. W. Spurrier, restraining John R. Spurrier from going upon his wards' premises or interfering with the respondents in their custody of the wards.

By the Court: It is so ordered.

Note.—See under (1) 28 C. J. pp. 1067, § 25, 1095, § 108. (2) 29 C. J. pp. 109, § 101, 113, § 108, 114, § 108, 116, § 112. (3) 28 C. J. p. 1111, § 174.