[No. 29129.   Department One.   October 27, 1943.]

J. L. JONES, *Appellant*, v. ALTA MAE McCLOUD, *Respondent.*[1]

*Bryan & Arthur,* for appellant.

*Marion Garland, Sr.,* and *Marion Garland, Jr.,* for respondent.

JEFFERS, J.—This action was instituted by J. L. Jones, against Alta Mae McCloud, in the superior court for Kitsap county, on March 18, 1943, for the purpose of compelling defendant to return to plaintiff, who is a resident of Deschutes county, Oregon, the custody of their minor son, James Lee Jones.

While plaintiff's pleading is denominated a complaint, it was considered by the courts and the parties hereto as an application for a writ of *habeas corpus,* and we shall so

[1] Reported in 142 P. (2d) 397.

consider it. It is alleged in this application, in substance, that defendant is the former wife of plaintiff; that James Lee Jones is the minor son of these parties; that a decree of divorce was entered by the circuit court of Oregon for Deschutes county, on February 27, 1942, whereby the marriage of plaintiff and defendant, then Alta Mae Jones, was dissolved. It is further alleged that the decree contained, among others, the following provision:

"It is further ORDERED, ADJUDGED AND DECREED that the plaintiff [J. L. Jones] be and he is hereby awarded the care, custody and control of Irving Jones, minor adopted son of plaintiff and defendant; and that he be, and he is hereby awarded the care, custody and control of the minor son of plaintiff and defendant, to-wit, James Lee Jones; provided, however, that the defendant [Alta Mae Jones] shall have the right and privilege, if she so desires, to have and take into her care and possession said minor child, James Lee Jones, during the months of June, July and August of each year, or during the school vacation period each year, until the further orders of this court."

It is further alleged that, notwithstanding the decree, defendant, while in temporary possession of James Lee Jones, took the child from the state of Oregon to Kitsap county, Washington, and refuses to return him to plaintiff, and that defendant is withholding the child in Kitsap county unlawfully. Plaintiff asks that the defendant be required to return the child to him.

Upon the filing of the application and an affidavit by one of plaintiff's attorneys, the court directed that a writ of *habeas corpus* issue, directed to defendant, requiring her to bring the minor, James Lee Jones, before the court on March 22, 1943.

Defendant appeared on March 22nd, and filed an answer and cross-complaint. The answer set out certain purported facts which occurred prior to the entry of the divorce decree, because of which defendant alleged she was deceived as to the effects of the decree. Among her allegations is one to the effect that, in the complaint served upon her, plaintiff asked that he be permitted to have the custody of

the child for six months, and that defendant have his care and custody for six months. She also alleged that plaintiff sent her a letter (defendant's exhibit 1), dated February 3, 1942, stating that he was to have the child for three months in the summer, and further stating that he was sick when he signed the papers and did not know just what he signed. Defendant then quoted from the letter as follows:

"I suppose that Jimmie will spend most of his time at mother's. And Alta I promise that regardless of six or three months I would not keep him away from you or mother that long. I just have to see him at least once a month, and I promise not to have him here over a month at a time unless it is agreeable to both you and mother. And there is one request I make of you. That is when he starts to school and I come to see him that I can take him to mother's on Saturday and Sunday as I feel at home there and I am not sure how I would feel at your home. Alta Mae, I hope that you do not think it necessary to file a cross-complaint as then I would be compelled to file one that would drag the case on perhaps for months and be very unpleasant to all of us probably for a long time afterwards."

While the above is all that is quoted from the letter in the answer, we desire at this point to set out the closing paragraph of the letter:

"But if we just respect each other's right to enjoy him, I can't see any reason to ever have any trouble of any kind. Anyway it will be so much better for Jimmie to always see us as friends, as there is no one that can ever take the place of a child's own parents (unless it's a grandmother). I have no intention at present of ever marrying again, but if I ever do there will not be any stepmother stuff pulled off. Well, Alta Mae, may we always be friends. And I wish you all the luck and happiness possible, and I mean just that."

It is further alleged in the answer that defendant took a trip to California, and while there she heard that plaintiff had the child; that she returned as soon as she could, went to plaintiff's home, and took the child, subsequently coming to Bremerton, Washington, where she has lived since; that defendant and the child are now residents of Bremerton; that defendant did not know of the contents of the divorce

decree until October, 1942, when she sent to Bend and obtained a copy thereof. It is further alleged that plaintiff secured the divorce through trickery and fraud.

In the cross-complaint, defendant alleged that she has been a resident of Kitsap county since August 16, 1942, and that plaintiff at all times knew where the child was; that she has a good home and good surroundings in Kitsap county.

Plaintiff by his reply denied the affirmative matter set up in the answer. Plaintiff demurred to defendant's answer and cross-complaint, which demurrer was overruled.

The matter came on for hearing before the court on March 31, 1943, and thereafter the court made and entered its judgment, wherein it was ordered that the writ be denied, and that defendant be given the care and custody of James Lee Jones, with the right of plaintiff to visit the child at all reasonable and proper times. This appeal by plaintiff followed.

While in view of the statement made by this court in *In re Groves,* 109 Wash. 112, 186 Pac. 300, to the effect that when a child has become domiciled in another state the courts of the place of domicile may, at the least, determine the custody of such child as its welfare may demand, in all cases where there are shown changes of conditions arising subsequent to the entry of the original decree, we do not deem it proper in a proceeding of this kind to consider facts occurring prior to the original decree; yet, in order that we may have some of the background of these parties, we desire to set out part of the testimony relative to facts shown to exist prior to the original decree, as well as those arising subsequently.

Appellant is now a man about fifty-three years of age. He is, and for about twenty-five years has been, the owner of a dairy ranch located approximately eleven miles from Bend, Oregon. The ranch is well improved, and is located conveniently to school. The parties have an adopted son, now nineteen years of age, who lives on the farm. This boy is a highschool graduate, and has taken a prominent part in

local 4-H club work. Appellant is a man of unquestioned reputation, and apparently able in all respects to care for and educate the minor child who is the subject of this litigation. No charges of any kind are made by respondent against appellant.

Respondent abandoned appellant in May, 1938, the reason for such abandonment not appearing in the record, and went to Portland, where her mother lives. About seven months after respondent left appellant, she gave birth to a child, whom she named James Lee Jones. Respondent did not inform appellant of the birth of this boy, and appellant did not know of his birth until some two months thereafter, when he learned of it from a sister of respondent.

After respondent went to Portland, she worked at such jobs as she could find, such as a waitress, housekeeper, etc., and, during all the time she was in and around Portland and up until the divorce, it is apparent from the record that the child was, for the greater part of the time, with her mother. Respondent testified that her mother had a very large share in raising the boy. Respondent admitted that, for a time after she went to Portland, a man by the name of Monroe contributed to her support. Nothing further relative to the relation between Monroe and respondent appears in the record.

After appellant learned of the birth of his son, he went to Portland every month to see him, and, according to his testimony, he would take the boy presents and would take potatoes and other food to the grandmother, where the child was living. Respondent denied that during this period appellant bought the boy clothes, food, or paid any of his doctor bills, although she testified he brought the boy some presents.

Appellant testified that he did not want a divorce, and so matters went along until sometime before the divorce action was started in 1942, when respondent requested appellant to get a divorce, stating that she wished to marry Mr. McCloud, whom, the record shows, she had known some six or seven months. Appellant then had the complaint

prepared on the ground of abandonment. In the complaint which was served on respondent, appellant asked that he be given custody of James Lee Jones for six months out of each year, and that respondent be permitted to have his custody during six months of the year. It was subsequent to the preparation of the complaint that appellant wrote the letter to respondent hereinbefore referred to. Thereafter, on February 27, 1942, the Oregon court heard the cause and entered the decree above referred to. It is apparent from the decree that the court concluded the care and custody of the minor should be given to appellant, regardless of the prayer of the complaint.

Immediately after the entry of the decree, respondent left Portland for San Diego, California, for the purpose of marrying Mr. McCloud, who is in the army and was at that time stationed at San Diego. Upon her arrival in San Diego, respondent and Mr. McCloud, with another couple, left for Yuma, Arizona, where respondent and Mr. McCloud were married, March 14th. Respondent admitted that she knew she could not be married in Oregon until six months after a decree of divorce, but stated that she thought if she went to another state the marriage would be legal.

Shortly after the divorce, appellant, with the consent of respondent and the grandmother, with whom the child had been left, went to Portland, got the child, and took him out to the ranch. This was the first time the child had been at his father's home.

After her marriage, respondent stayed in California, visiting her husband, and working to help pay expenses. Mr. McCloud was finally transferred to Fort Ord, California, and respondent, about the middle of July, returned to her mother's home in Portland. Respondent testified that she knew where the child was, but admitted she never wrote Mr. Jones about the boy, or at all, while she was in California. She further testified that she had to work to get money to come home. A day or two after her arrival in Portland, she went to appellant's ranch, where she stayed three or four days. Appellant took respondent and the boy

back to Portland, with the understanding, as he testified, that respondent would come back in a week or two and cook for Irving and him during harvest. Respondent testified that she told appellant that she would take up with her husband the matter of whether or not she should go back to the ranch, and, if agreeable to him, she would go back and look after the house during haying. When respondent did not return with the boy, appellant wrote her, and, receiving no answer, he went to Portland, where he was informed by respondent's mother that she had taken the boy and gone to Bremerton. Appellant then wrote several letters to respondent, but received no reply, and thereafter he had his attorney write to her.

Respondent testified that, after receiving a letter threatening to start kidnaping proceedings if the boy was not returned, she wrote to Bend and procured a copy of the divorce decree, and for the first time learned that the custody of the child had been awarded to his father. This was in the latter part of September, 1942.

Respondent testified that she came to Bremerton, August 16, 1942; that she came to stay. Mr. McCloud is now with the armed forces serving overseas. The only home which respondent has is a room in the home of Mrs. Jenkins, a niece of respondent, where respondent takes care of Mrs. Jenkins' two small children and the home, for which services she receives room and board for her son and herself. At the time respondent went to the Jenkins' home, Mrs. Jenkins was working in the navy yard, but she is now working nights at a skating rink. Mr. Jenkins is employed at the navy yard.

Respondent testified she was making arrangements to build a house, and Mr. Jenkins, her nephew, testified concerning this house, as follows:

"Well, she had propositioned me to get part of my lot, and I have guaranteed it to her; and I'm going to build the house myself, that is, she is to supply the money."

Mr. and Mrs. Jenkins testified that respondent is a good mother, and is taking good care of the boy. It does not

appear how permanent the work which respondent is now doing may be. It further appears that respondent is now receiving seventy dollars per month from the government.

Without setting out or discussing separately appellant's assignments of error, we think it may be said they all go to the question of whether or not the trial court was justified in entering a decree in this case different from that entered by the Oregon court.

While this court, in several cases to which we shall refer, has held that the courts of this state have jurisdiction, in a proper case, to hear all relevant testimony offered by either party in regard to the custody of a minor child domiciled in this state, and enter such judgment as will be for the best interests of the minor, even though the judgment be different from that entered by a sister state, where it is shown to the courts of this state that the condition of the parties has so changed since the entry of the judgment by the sister state that the welfare of the minor requires that the courts of this state hear and determine the question presented; yet we think that, included in the question presented, there is really the further question of whether or not the minor did in fact have a residence or a bona fide domicile in this state.

While not all of the cases discuss very fully, and some of them not at all, the question of domicile or residence, nevertheless the question is there, and we think considered, whether expressly referred to or not.

Before we discuss the case of *Motichka v. Rollands*, 144 Wash. 565, 258 Pac. 333, which we think is determinative of this action on the question of the residence and domicile of the minor here involved, we desire to discuss several other cases referred to in the briefs.

In *In re Groves*, 109 Wash. 112, 186 Pac. 300, the statement is made that

"The weight of authority is to the effect that, when the child has become domiciled in another state, the courts of the place of domicile may, at the least, determine the custody of such child as its welfare may demand, in all cases where

there are shown changes of conditions arising subsequent to the entry of the original decree."

In the cited case, the original Colorado decree awarded the custody of the minor to her grandmother, who lived in Bellingham, Washington. The mother, pursuant to the decree, and with the knowledge of the father, took the child to the grandmother at Bellingham. Thereafter, the father obtained a modification of the decree by the Colorado court, awarding the custody of the child to him. After the child had been in this state about a year, and after the modification of the decree, the father came to this state and attempted to take possession of the child. We held that the court was justified in hearing the case and awarding the custody of the child to the mother. It is apparent that in the cited case the child had been brought to Washington pursuant to the decree of the Colorado court, and there is no question but that the bona fide domicile of the minor had been sufficiently established to be in this state.

In the case of *McClain v. McClain,* 115 Wash. 237, 197 Pac. 5, 202 Pac. 173, the question of the residence or domicile of the minor there involved was not discussed, but on a rehearing of the case we upheld the custody of the minor as fixed by the Texas court, where the original decree was entered.

In the case of *In re Penner,* 161 Wash. 479, 297 Pac. 757, wherein the court assumed jurisdiction to hear testimony relative to the custody of a minor child whose custody had prior thereto been awarded to the father by a Montana court, we referred to and distinguished the case of *Motichka v. Rollands, supra,* stating:

"In view of the much greater period of time that the children of the parties now before the court were physically present within this state, and in consideration of all the facts here shown, we hold that in the case at bar the superior court was justified in hearing the evidence and inquiring fully into the circumstances."

The cited cases show clearly that, before the courts of this state will enter a decree different from that entered by

a sister state relative to the custody of a minor domiciled in good faith in this state, the changed condition of the parties claimed to have occurred since the entry of the original decree must be a real and substantial change and one which really affects the welfare of the minor.

. While the factual situation in the case of *Motichka v. Rollands, supra,* is somewhat different from that of the instant case, we think what was stated by this court therein is applicable herein. In the cited case, the father attempted, by *habeas corpus* proceedings in Chelan county, to obtain possession of his minor daughter, Eva Irene, whose custody had been awarded to him by a Montana court. The minor had been allowed by her father to go to her mother, who had subsequently remarried and was living in Chelan county. The decree provided that the mother have the custody of the minor during the school vacation period. The mother refused to return the child to the father, who then came to this state and instituted the above action. It seems to us that what was stated in the cited case is so applicable generally to cases of this character, and to this case in particular, that we quote at some length therefrom:

"The trial court denied appellant's [the father's] prayer for relief and awarded Eva Irene to respondent, manifestly upon the theory that there had been such changed conditions of the parties affecting Eva Irene's welfare that called for the placing of her in the custody of respondent and taking her from the custody of appellant; the trial judge being of the opinion that the Montana decree of divorce was no longer of any binding force, because of such changed conditions and because of the physical presence of the child within the territorial jurisdiction of the trial court. It is apparent that Eva Irene was not sent to respondent at Leavenworth in this state with a view of becoming a resident of, or becoming domiciled in, this state; that is, it is apparent that appellant never had any such intention and never evidenced to respondent or her mother, or anyone else, any such intention. It is also apparent that Eva Irene never had a residence or domicile in this state or in any other state than Montana. The child was but temporarily sojourning in this state.

"We read in section 1, Article 4, of the Constitution of the United States, that:

" 'Full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state.'

"It seems to us that the trial court has erroneously ruled, or in any event erroneously assumed, that this constitutional mandate is of no controlling force in this case, because Eva Irene is physically within the territorial jurisdiction of that court; and that, therefore, the divorce decree of the Montana court awarding her custody to appellant may be ignored here, upon showing of change of conditions since the rendering of the Montana decree of divorce.

"It may be assumed that the general sovereign guardianship of the state is such that it extends over the persons of all minors residing or domiciled within its borders, even to the extent of not being bound by a judgment of a sister state rendered with reference to the personal guardianship of a minor while a resident and domiciled in such sister state. It may also be assumed that the general sovereign guardianship of the state is such that it extends to the temporary protection of all non-resident minors, while temporarily in the state. But no decision has come to our notice holding or suggesting that the courts of one state may permanently assume general guardianship over a minor temporarily sojourning in the state, who is a resident of, or has its domicile in, another state. While this is a *habeas corpus* proceeding in form, it is, in substance, but a controversy between these parties over the rightful custody of Eva Irene; and the judgment rendered in this case is in substance, an awarding of her to respondent and in effect permanently depriving appellant of the custody of the child and of his right to take the child back to Montana the place of his and its residence and domicile. It seems to us that, under the circumstances here shown, the decree of the Montana court awarding Eva Irene to appellant must be given full faith and credit and recognized as a final adjudication on that question, until modified by that court, or until Eva Irene ceases to have her residence and domicile in the state of Montana.

"Much is said in the brief of counsel for respondent touching the present welfare of the child in the light of what is claimed to be changed conditions of the parties and of the child since the rendering of the Montana divorce decree. Were it necessary to go into that particular phase of the

controversy, much apparently well grounded argument could be advanced both for and against the desirability of change of the custody of Eva Irene; but that, we think, is foreign to our proper inquiry here to be made, in view of the fact that Eva Irene is not, and never was, a resident of or domiciled in the state of Washington, but has always, since her birth, been a resident of and domiciled in the state of Montana."

The judgment was reversed, and the custody of Eva Irene awarded to the father, to the end that he might take her to his and her home in Montana, where the question of her custody might be further considered and determined, if petitioned for, by the courts of that state.

■ While we are of the opinion that there was no such change of conditions shown to exist in the instant case as to warrant the trial court in entering the decree herein, however we are convinced that, in this case the residence and domicile of appellant having at all times been in Oregon, and it appearing that under the divorce decree the custody, care, and control of the minor was awarded to appellant, and it further appearing that respondent, under the decree, was only permitted to have the minor during the months of June, July, and August, and that, at the time she obtained possession of the minor, it was with no thought on the part of appellant that she would take him out of the state, or that it was to be other than a temporary possession, the minor never became a resident of, nor can it be said he was domiciled in, the state of Washington, regardless of what respondent may claim relative to her having become a resident of this state. The residence and domicile of the minor remained in the state of Oregon, where appellant resided and was domiciled. What we have said relative to the domicile of this minor is supported by our decision *In re Burns,* 194 Wash. 293, 77 P. (2d) 1025.

For the reasons herein assigned, the judgment of the trial court is reversed and remanded, with directions to the trial court to enter judgment awarding the custody of James Lee Jones to his father, appellant herein, to the end that the father may take his son to their home in Oregon, where the

question of the custody of the minor may be further considered and determined, if petitioned for, by the courts of that state.

We are further of the opinion that the remittitur in this case should go down immediately upon the filing of this opinion, and that immediately upon receipt of such remittitur the trial court should take such steps as may be necessary to place this child in the temporary custody of some officer of the court, such officer to deliver the minor into the custody of appellant, upon his demand so to do.

SIMPSON, C. J., BEALS, STEINERT, and GRADY, JJ., concur.