No. 18,164.

DIANA GAYLE EVANS, ETC. *v*. CHARLES D. EVANS.
(314 P. [2d] 291)

Decided August 12, 1957.

Messrs. Shafer & Newcomb, for plaintiff in error.

Messrs. Sears & Goldsmith, for defendant in error.

*En Banc.*

Mr. Justice Hall delivered the opinion of the Court.

Plaintiff in error was petitioner below, and we refer to her as *Diana*. Defendant in error was respondent below and we refer to him as *the father*. The action was brought in behalf of Diana by her mother and we refer to her as *the mother*. The father and mother, lifelong residents of Wyoming, were married at Billings, Montana, on June 22, 1941. The matrimonial domicile was always at Lovell, Wyoming. A daughter Sharon was born in 1942; Diana was born March 15, 1946. In 1951 the father brought suit for divorce in the District Court of Fremont County, Wyoming (the grounds alleged do not appear in the record). The mother filed her cross petition and on November 21, 1951, the Wyoming court

granted to the mother an absolute divorce. The court found:

" * * * the parties have been separated for more than two years last past and immediately preceding this action, and that said separation was not caused by the fault of the defendant (the mother) and that she should be granted a decree of divorce on the grounds of desertion.

"The court further found that both parties were fit and proper persons to have the care and custody of the minor children of the parties. * * * "

The decree provided:

"That the principal care, custody and control of the minor children of the parties, to-wit, Sharon K. Evans, age 9, and Dianna Gayle Evans, age 5, be and hereby is awarded to the defendant Selma Evans for the nine school months of each year, and to the plaintiff Charles D. Evans for the three summer months of each year, subject to a right of visitation reserved to each parent while the said children are in the custody of the other, parents to have custody on alternate Christmas vacations."

The father remarried and until 1955 lived at Riverton, Wyoming, some 165 miles from Lovell where the mother continued to live, she being there employed as business office clerk of the telephone company. During the years 1952, 1953, 1954 and 1955 the mother and father exercised alternate custody of Sharon and Diana as provided in the divorce decree. Sometime in 1955 the father's employer transferred him to Denver where he and his present wife established their home and have since resided. At the close of school in 1956 Sharon, who was then about fourteen years of age, refused to go to the father and she remained with her mother. During the second week of June 1956 the father took Diana to the new home in Denver.

School opened at Lovell on September 4, 1956, but Diana remained in Denver. On September 18, 1956, the father called the mother and advised her that Diana was

in a private school and that she was not going back to Wyoming. On September 25, 1956, the mother in behalf of Diana instituted this action seeking a writ of habeas corpus; the writ was issued forthwith directing the father to show cause on September 27, 1956, why Diana should not be turned over to the mother. By stipulation the hearing was continued to October 2, 1956. On October 1, 1956, the father filed his return, answer and *counterclaim* in which he admits the Wyoming court had jurisdiction over the parties to the divorce action, including the children, and admits the divorce decree and custody order. As an affirmative defense and counterclaim he alleges:

" (a) Petitioner is presently domiciled in this state.

" (b) Change of custody of petitioner to respondent alone is necessary for the protection of petitioner.

" (c) Petitioner's mother, Selma Evans, is not a fit person to have custody of petitioner in that she takes petitioner to improper parties ('Russian Hops'), has alcoholic parties at her home, teaches petitioner dishonesty, has and exhibits within petitioner's view and reach indecent objects, and otherwise.

" (d) Petitioner is in danger of succumbing to the influences described in paragraph 3, preceding.

" (e) Petitioner desires to be in the sole custody of respondent.

" (f) The acts in paragraph 3, supra, occurred or became known to respondent after the divorce decree and within the past few months."

Trial was to the court on October 2, 1956. The mother testified that the father had refused to return Diana for the opening of school and had stated she was not going to be returned; she identified the divorce and custody decree which was admitted in evidence.

In behalf of the father Dr. Hilton, a specialist in the diagnosis and treatment of nervous and mental diseases, testified that on September 28, 1956, the father had taken Diana to his office; that he had spent about thirty

minutes in consultation with Diana, had found her "apprehensive about having to return to her mother," and from his consultation with Diana had come to the conclusion and expressed as his opinion: "I would say I agree she should not be returned to her mother." Dr. Hilton had never met the mother nor did he know anything about the problem except such facts as he elicited from Diana.

The father testified that on numerous occasions he had observed empty beer cans in the mother's home, that the mother read and kept in the home cheap novels, that she had in the home two "pot holders" that were lewd and obscene, that Sharon and Diana had *told him* that the mother in speaking of the father and stepmother used vile language, highly descriptive if somewhat inelegant. He also testified that: "Diana has stated each and every summer, and it has been getting worse each year, that she did not want *to go back to* Wyoming." (Emphasis supplied.)

The stepmother testified that Diana had a fine home life in Denver and did not want to go back to her mother and had repeatedly stated that if taken back she would run away. In speaking of her school work (three weeks in Foster Elementary School in Arvada) she testified:

"Her grades are excellent grades. The teacher *tells us* she is doing very nicely."

The stepmother would like to have Diana continue to live with her in Denver. She has a twelve-year-old daughter at home with whom Diana gets along well. Diana and her sister, Sharon, did not get along well together.

As rebuttal the mother admitted drinking an occasional beer at home, admitted she read novels, admitted having received as a gift and keeping in a drawer in her bedroom the two pot holders. She testified that Sharon and Diana had a good clean moral home life with her — in this she was corroborated by a neighbor who has lived across the street from her and has known her for

seventeen years and whose daughter plays with Sharon and Diana; she was also corroborated by a cousin who for twenty years has lived adjacent to the mother's home and whose three children play with Sharon and Diana. Pursuant to agreement of counsel the trial judge conversed privately with Diana. The record shows none of the conversation, but the trial judge in his pre-judgment comment stated: "The child told me she wanted to stay here, and she is very bitter about going back."

The trial judge made no findings but did make a statement at the close of the case and from which we quote:

"It seems to me primarily that the underlying reason for this case is that there are two philosophies of a way of life here. We have a young lady here who has apparently made some observations along that line and has noticed that; she has made an appraisal in her own mind about these two ways of life. That is the way I feel about it. I don't condemn either party here for the ways they live at all, but they are materially different. * * *

" * * * But for some reason or another we have a child here ten years old who is bitterly opposed to going back to her home from whence she came. I would think that ordinarily a child ten years of age would want to go back to that home; but for some reason or other there is a bitter resentment towards wanting to go back to the home. * * *

"When a child ten years old, who shows intelligence, has made a choice of that sort it is a very, very heartbreaking and difficult thing to have to send her back. * * *

"Now, to make a long story short: I realize the mother's natural and legal right to the custody of the child, but there has been so much doubt created in the mind of the Court as to the fitness of this home for the child, and in the light of the training that she has had in her father's home, and there seems to be such a difference between the children — one child seems to fit into that home. She has no desire apparently to forsake it. The

other child for some reason or other is bitterly opposed to going back, and I deduce from that that there must be something wrong there somewhere.

"I think it is in the best interests of the child that the writ be discharged and the child remanded to the custody of the father until further order of the Court."

On October 4, 1956, the following order was entered:

"ORDERED: Discharge the writ of Habeas corpus and remand the child to the custody of the respondent (the father). Motion for new trial is deemed unnecessary and motion therefor is dispensed with; and sixty days allowed to tender and file reporter's transcript."

By writ of error the mother seeks to have this order reviewed and set aside and to have Diana delivered to her custody for return to Wyoming.

It will be observed that the trial court made no finding, formal or informal, that Diana was domiciled in Colorado on September 25, 1956, or at any other time; made no finding whatsoever that conditions are so changed as to warrant altering the custody; made no finding that the mother is not a fit and proper person to have the custody of her daughter; there is no finding that the Wyoming home is unfit, though the trial judge does express doubt of its fitness. He states the basis of his doubt in the following words:

"The other child [Diana] *for some reason or other* is bitterly opposed to going back, and *I deduce from that that there must be something wrong there.*"

If this deduction is warranted, then by the same token Sharon's refusal to live with her father and stepmother should lead to the deduction that there must be something wrong with the father's home. The evidence and statement of the court do not sustain the judgment. Judgments must be based on facts—a judgment founded on doubts cannot stand.

There is no suggestion in the record that the Wyoming court did not have jurisdiction over both parents and the children and jurisdiction to make the cus-

tody award, which award was made after hearing at which the parties were present and each represented by counsel. The Wyoming court found the mother a fit and proper person to have custody, and awarded her custody during the school year. That order has never been modified and the parties abided by it for four years. The father's conduct in refusing to abide by the Wyoming decree, his detention of Diana in Colorado when he well knew that the Wyoming decree required Diana's presence in school in Wyoming in the care and custody of her mother, cannot be approved. Conditions of which the father now complains are not new; he had four years while a resident of Wyoming to seek a modification of the decree for the same reasons he now advances; he took no steps in that direction, but once having gotten Diana beyond the jurisdiction of the Wyoming court he becomes very critical of the mother, overrides the judgment of the Wyoming courts and stands in defiance thereof. In so doing he is following the unfortunate and all too prevalent pattern of many divorced parents as evidenced by hundreds of adjudicated cases, including several from Colorado to which we will refer.

It is well settled that the domicile of a child follows that of its parents; in the event of separation or divorce the domicile of the child follows that of the parent to whom custody is decreed.

The evidence shows conclusively that Diana was not domiciled in Colorado at the time this suit was commenced. Assuming, but not deciding, that Diana was domiciled in Colorado during the three months that custody was awarded the father by the Wyoming decree, that period had expired on or before September 4, 1956, and this action was commenced September 18, 1956, at which time Wyoming had decreed that Diana be in the custody of her mother in Wyoming.

In *Jones v. McCloud*, 19 Wash. (2d) 314, 142 P. (2d) 397, the facts are very similar to the facts in the case under consideration. In a divorce proceeding, an Oregon

court having unquestioned jurisdiction, had awarded custody of a minor child to the father and had granted the mother:

"The right and privilege, if she so desires, to have and take said minor child, James Lee Jones, during the months of June, July and August of each year or during the school vacation period each year until the further orders of the Court."

The mother had possession of the child in Oregon pursuant to this order, refused to return the child to the father at the appointed time, and took the child to the state of Washington where the father instituted proceedings in habeas corpus. The trial court denied the writ, awarded custody to the mother, and granted visitation rights to the father. The supreme court in reversing the judgment said:

"While this court, in several cases to which we shall refer, has held that the courts of this state have jurisdiction, in a proper case, to hear all relevant testimony offered by either party in regard to the custody of a minor child domiciled in this state, and enter such judgment as will be for the best interests of the minor, even though the judgment be different from that entered by a sister state, where it is shown to the courts of this state that the condition of the parties has so changed since the entry of the judgment by the sister state that the welfare of the minor requires that the courts of this state hear and determine the question presented, yet we think that, included in the question presented, there is really the further question of whether or not the minor did in fact have a resident or a bona fide domicile in this state.

"While not all of the cases discuss very fully, and some of them not at all, the question of domicile or residence, nevertheless the question is there, and we think considered, whether expressly referred to or not."

\* \* \*

"While we are of the opinion that there was no such

change of conditions shown to exist in the instant case as to warrant the trial court in entering the decree herein, however we are convinced that, in this case the residence and domicile of appellant having at all times been in Oregon, and it appearing that under the divorce decree the custody, care and control of the minor was awarded to appellant, and it further appearing that respondent, under the decree, was only permitted to have the minor during the months of June, July and August, * * * the minor never became a resident of, nor can it be said he was domiciled in, the state of Washington, regardless of what respondent may claim relative to her having become a resident of this state. The residence and domicile of the minor remained in the state of Oregon, where appellant resided and was domiciled. * * *

"For the reasons herein assigned, the judgment of the trial court is reversed and remanded, with directions to the trial court to enter judgment awarding the custody of James Lee Jones to his father, appellant herein, to the end that the father may take his son to their home in Oregon, where the question of the custody of the minor may be further considered and determined, if petitioned for, by the courts of that state."

The above case is cited as authority in *McMillin v. McMillin,* 114 Colo. 247, 158 P. (2d) 444, wherein this court gave full faith and credit to a Michigan decree awarding custody. The following language from *McMillin v. McMillin,* supra, is controlling in this case:

"The Michigan court had jurisdiction over both respondent and the child in the divorce proceeding, since all were domiciled and present in that state when the action was begun and respondent appeared and was represented by counsel therein. This jurisdiction included not only the issue of divorce, but of support and custody as well. We think the better rule is that, jurisdiction once having attached was not divested by any change of domicile as to the final decree of divorce and

the award of custody in that decree. * * * Such an award of custody by a court having jurisdiction should be recognized by other states and the facts upon which the award was based held res judicata. * * * The forum of the domicile where the parties are known, where the matrimonial difficulties occurred, and where the evidence is available, is most likely to make just decisions of such issues, and it promotes neither justice nor respect for the courts to permit a spouse in prospect of an unfavorable decision to find sanctuary in another jurisdiction where adverse evidence is not available and the other spouse may not be able to appear.

"After a final decree in divorce, either party may change domicile at will; the child's domicile then changes with that of the parent in whose custody he has been placed and the court of new domicile has jurisdiction over proceedings as to custody. After such change of domicile we have held that any modification of the provisions of the final decree as to custody by the court of the former domicile is without extraterritorial effect in Colorado. *People ex rel. v. Torrence,* 94 Colo. 47, 27 P. (2d) 1038, and *Hodgen v. Byrne,* 105 Colo. 410, 98 P. (2d) 1000. * * *

"It is true, as urged by respondent's counsel, that the primary and controlling issue is the welfare of the child, but that issue was considered and determined by the Michigan court and cannot and should not be readjudicated here."

In Crocker v. Crocker, 122 Colo. 49, 219 P. (2d) 311, custody of the child had been awarded to the mother by an Illinois court and the father surreptitiously brought the child to Colorado and for four and one-half years the mother had no knowledge of the whereabouts of the father or child. On discovery of their presence in Denver she filed her petition for a writ of habeas corpus. The trial court granted the writ and ordered the child placed in the custody of the mother. In affirming the judgment of the trial court we said:

"It is undisputed that the minor child was in respondent's custody on August 24, 1945. Respondent, by his entry of appearance, was then within the jurisdiction of the Illinois court, giving that court jurisdiction to enter and enforce orders against him personally and concerning the minor child then in his custody. * * * The record considered, we think it inescapable that respondent's sudden determination to leave Illinois with the minor was for the purpose of evading any orders respecting the child's custody and control which might be entered by the court in the divorce action, and it is inconceivable that one who had a proper regard for his child's welfare would keep its whereabouts concealed from the mother for four and a half years, unless it was to evade orders which might properly be made for the child's custody. * * * If respondent's conduct respecting the minor child is here approved, we would sanction and reward one who fled from one jurisdiction into another to evade the orderly process of the court which he conceded had jurisdiction, not only with reference to matrimonial differences, but also as to the care and custody of his child, and this conduct does not appeal to us as one deserving commendation.

\* \* \*

"* * * Without reference to the provisions of the full faith and credit clauses in the federal Constitution, we hold that under the evidence before us the Illinois court, in which the divorce decree was granted, had jurisdiction to determine who should have the care and custody of the minor child, taking into consideration its welfare, and that respondent, by reason of his conduct in taking the child from Illinois, is not in position, in Colorado, to insist that the courts in this jurisdiction change or modify the conditions of the Illinois court decree. Respondent's relief, if any is to be accorded him, must first be sought in the court to the jurisdiction of which he submitted his marital difficulties, as well as the question of the care, custody and control of the minor. By his appear-

ance in the divorce action in the Illinois court, respondent irrevocably admitted the jurisdiction of that court and consented that it might make proper orders regarding the care, custody and control of the minor."

Counsel for the father rely heavily on *People ex rel. Wagner v. Torrence,* 94 Colo. 47, 27 P. (2d) 1038. We feel that counsel has overlooked one very vital difference in the facts in that case and in the facts in the case at bar. In the Torrence case the Wisconsin court had granted full time custody to the mother, the father had visitation rights only. True, the decree provided the children should not be removed from the state of Wisconsin and the mother violated this provision and brought the children to Colorado, thereby being in contempt of the Wisconsin court; even so, she retained her position as *sole legal* custodian of the children. In the case at bar the father ceased to be the *legal* custodian of Diana on or before September 4, 1956. The court said:

"The mother had the legal custody of the children when she crossed the Wisconsin border and that remained with her when she settled in Colorado. Violation of the removal order did not of itself defeat her custody. It subjected her to punishment for contempt. When she domiciled in Colorado, it became the domicile of the children."

The following language from *Averch v. Averch,* 104 Colo. 365, 90 P. (2d) 962, is applicable to the case at bar:

"We have here a mother attempting to regain the custody of a child of tender years. 'It is well settled * * * that courts will not deprive the mother of custody of her child unless it is shown clearly that she is so unfit a person as to endanger the child's welfare.' 19 C.J. 351. There is no evidence in the record here that plaintiff was in any way an unfit person to have custody of her child. We note that at the time of the modification of this decree the trial court stated, 'that the plaintiff is pretty nervous and excited and disturbed.' Such was to be expected under the circumstances. Depriving this

girl of tender years of the love and care of her mother not only was unfair to the child, but also was unjust to the mother."

The judgment of the trial court is reversed and the cause remanded with directions to the trial court to enter judgment returning Diana forthwith to the mother Selma Evans, to the end that the mother may take Diana to her home in Wyoming, where on request of any person in interest the question of the future custody of Diana may be further considered and determined by the courts of Wyoming; said judgment shall assess all costs in the trial court and this court against the defendant in error.