In the Matter of the Application of Arthurine LaWanda Cocanougher Hollick, for a Writ of Habeas Corpus.

**Arthurine LaWanda Cocanougher HOLLICK, Applicant,**

**v.**

**Ellen McDANIEL, Respondent.**

**No. 41178.**

Supreme Court of Oklahoma.

April 20, 1965.

As Amended May 3, 1965.

Franklin, Harmon & Satterfield, Oklahoma City, for petitioner.

David M. Cook and Gomer Smith, Jr., of Smith, Johns & Neuffer, Oklahoma City, for respondent.

BLACKBIRD, Justice.

The present action was instituted upon an application by petitioner, Mrs. Hollick, for a writ of habeas corpus directing respondent, Mrs. McDaniel, to bring into court Franki Ann Cocanougher, petitioner's nine-year-old daughter by her divorced husband, Frank M. Cocanougher. Respondent is Cocanougher's 66-year-old mother.

Petitioner and Cocanougher, who was her second husband, were married in 1952. The first year of their marriage they lived with respondent. In 1956, they moved to Houston, Texas, where, shortly thereafter, petitioner became a laboratory assistant for a doctor there. After Franki Ann's birth on July 28th, 1954, petitioner and Cocanougher continued to live together until sometime in or about 1958, when they were separated, with the petitioner retaining the child's care.

In May, 1960, petitioner filed suit for, and in September of that year obtained, a divorce in Houston. The divorce decree gave her "full care, custody and control" of Franki Ann, but granted Cocanougher the right to have the child with him during two of the summer months, and certain weekends at other times, in each year. The decree also awarded petitioner child support of $100.00 per month for the ten months of each year that Franki Ann was to be with her.

Two years later, in September, 1962, petitioner married a man bearing her present surname. The record herein does not further identify Mr. Hollick, but one place in the testimony indicates that he has probably been referred to by the name of "Pete". After her remarriage, petitioner, at his request, gave up her position in the Houston doctor's office.

Before petitioner remarried, respondent, who resides with her retired husband in Midwest City, periodically visited her and Franki Ann in Houston, but thereafter, according to respondent, Mr. Hollick refused to let her do this, or even to see Franki Ann. Also, after this remarriage, petitioner's former husband, Cocanougher, would get drunk and make obscene and disturbing telephone calls both night and day to the Hollick office and home, after whose purchase petitioner had resumed her employment. Petitioner testified that, on one occasion before her remarriage, when she was confined to the hospital eight days for nervous-

ness on account of Cocanougher's conduct, she had left Franki Ann with him and his present wife. She further testified to the effect that when she went to their home to get Franki Ann, she found her in a sadly neglected condition and her father and his wife were so drunk they didn't even know when the two departed. After again becoming employed, petitioner was not home from work when Franki Ann returned there from school in the afternoons, and petitioner arranged with a neighbor to look out for her until she arrived home from work. Nevertheless, Franki Ann became apprehensive about staying at home alone and she, and the petitioner, developed such nervous conditions from Cocanougher's harassments, that they sought medical treatment.

In the Fall of 1963, petitioner's mother, who had resided in Okmulgee, became seriously ill and was confined in a Tulsa hospital. Petitioner first went to visit her there in October. When it appeared to her in November that her mother was "on her deathbed", Mr. Hollick drove her from Houston back to Tulsa, accompanied by Franki Ann. After three days there, Mr. Hollick returned to Houston with Franki Ann, while petitioner stayed in Tulsa, where she and her four sisters kept a 24-hour daily vigil on their hospitalized mother. A few days thereafter, petitioner learned by telephone call from Houston, that her husband was being hospitalized there with a bleeding ulcer. She then returned to Houston, where she telephoned respondent's Midwest City home and made arrangements with her and her husband for Franki Ann to go and stay with them. Accordingly, on November 24, 1943, petitioner sent Franki Ann to Oklahoma City via commercial airliner. With Franki Ann, she sent $40.00 and a supply of clothing.

Shortly thereafter, in December, petitioner became pregnant, and, on the following New Year's Day, her husband had to be hospitalized again. This time he had an infected pancreas and was in the hospital almost two weeks. After he was discharged from the hospital, petitioner telephoned re-

spondent and told her that she would come to Oklahoma City and get Franki Ann as soon as she could, but, in February, she almost had a miscarriage, developed phlebitis, and had to remain in bed a week. A few days after she had a prenatal checkup on March 4, 1964, when her doctor gave his opinion that the immediate danger of a miscarriage was past, she came to Oklahoma City to get Franki Ann. After visiting in respondent's Midwest City home less than a day, or only a short time, she returned to Houston without Franki Ann.

On Monday, March 16, 1964, respondent telephoned petitioner at Houston and refused to send Franki Ann to petitioner's home there. Petitioner then, on March 20, 1964, filed the hereinbefore mentioned application for habeas corpus writ. To said application, respondent filed a Response four days later, alleging, among other things, in substance, that Franki Ann was: "lawfully in her custody * * *," and further alleging that since petitioner's divorce from respondent's son (Cocanougher) " * * * a material change of condition has occurred in that petitioner has remarried and that petitioner's present husband has abused both petitioner and the child whose custody petitioner now seeks; that due to her physical and mental condition petitioner is not a fit and proper person to have the child's custody; and that the child's best interests 'made it imperative' that she 'remain in the custody of respondent.' The prayer of the response was, in substance, that the court deny petitioner's application ' * * * and leave * * * with respondent * * *' the minor's 'care and custody.' "

At the trial, which commenced the same day (March 24th), the hereinbefore related facts, and others, were established by undisputed evidence. Petitioner, when interrogated concerning the present state of hers and her husband's health, answered: " * * * we are both fine, now." When asked if she felt able to care for Franki Ann again, she testified to the effect that since she had passed the first three months of her

pregnancy, her doctor thought " * * * it would be relatively safe." Testimony was elicited on behalf of the respondent to the effect, among other things, that since Franki Ann had been in the Midwest City home of the respondent and her husband, her nervousness had virtually vanished; that she was happy and greatly improved since she began staying with them and attending a Midwest City school; and that she seemed to cherish and return the love and affection they lavished upon her, and to appreciate their tender care.

Before the end of the trial, it was indicated that the trial judge would talk to Franki Ann privately. At the close of the evidence the court announced he was staying the proceedings and continuing the matter until the end of school, and, in his remarks from the Bench, indicated that his principal interest at that time was in seeing that Franki Ann's schooling was not interrupted by going back to Houston, with only about 9 weeks remaining of her school term in Midwest City.

Consistent with such remarks, the court entered an order the same day (March 24, 1964) taking the case under advisement and deferring judgment therein until June 2, 1964. Also the court required that the minor remain with respondent until completion of the school year, but granted petitioner visitation rights in Oklahoma City, on alternate weekends.

When the case next came before the court on June 2, 1964, petitioner requested findings of fact and conclusions of law. Without the introduction of further evidence, the court filed written findings of fact and conclusions of law and entered judgment the same day in respondent's favor. In its judgment, the court incorporated, by reference, its written findings of fact and conclusions of law, and apparently recognized that the decree of petitioner's previous divorce in her home State of Texas, had legally vested Franki Ann's custody in her. The only basis for the court's denial of her application for the habeas corpus writ and simultaneous order purporting that

Franki Ann's care and "custody" should "remain" in respondent, was "a material change of condition * * * affecting (petitioner's) ability to furnish a proper home * * *" for the minor and "adversely affecting" her welfare.

After excepting to said judgment, petitioner filed what was entitled a *"MOTION TO VACATE ORDER AND RETURN MINOR CHILD * * * AND ALTERNATIVE MOTION FOR NEW TRIAL."* Among other recited grounds therefor, it was alleged in said motion, in brief substance, that since the domicile of the petitioner, carrying with it that of the minor child, Franki Ann, had always been in Texas, this Oklahoma court had no jurisdiction to change her custody from that decreed by the Texas divorce court; and that such purported change violates Sec. 1, Art. IV of the U. S. Constitution in refusing full faith and credit to said Texas court's custody judgment.

Petitioner's first "Proposition" for reversal of the trial court's order and/or judgment overruling her above described "combination", or "alternative", motion is as follows:

"Court Has No Jurisdiction To Annul Custody Order of Court of Competent Jurisdiction Where Child in State Temporarily Sojourning and Being Detained without Consent and Over Objection of Mother."

Consideration of the arguments pertaining to the above proposition renders appropriate a more detailed description of the trial court's written findings of fact and conclusions of law. In its first finding, the court found that Franki Ann was sent to Oklahoma "to make her home with" respondent. In the second one, he found that the child was sent "by her mother, the petitioner herein, with the request that" the child "be kept by" respondent "and entered in school." In its fifth finding, the court found that the child " * * * since November, 1963, has been legally within said State and domiciled and resident * * *" in respondent's home. Following these find-

ings, the court wrote, among others, the following pertinent conclusions of law:

"1—That this court has jurisdiction over the parties and subject matter herein.

"2—That Franki Ann Cocanougher has a legal residence for the purpose of this hearing in Oklahoma City, Oklahoma.

\* \* \* \* \* \*"

In support of her above quoted Proposition I, petitioner argues, in substance, that, in the evidence presented in the lower court, there was "not even a suggestion" that the arrangement between her and respondent for Franki Ann to be cared for in respondent's home here in Oklahoma "was more than a passing and temporary one." To paraphrase the question she poses: Why should she, a resident of Texas, be compelled to fight for her child, who is also a resident of that State, in a court of a foreign jurisdiction, 600 miles from her home? She maintains that: "The Texas Court has continuing jurisdiction over the custody of the minor and the so-called 'change of condition' (used as a legal makeshift here to avoid the plain language of the Constitution) occurred, if at all, within the jurisdiction of the Texas Court." In connection with her argument, petitioner quotes from Jamison v. Gilbert, 38 Okl. 751, 135 P. 342, 343, 47 L.R.A.,N.S., 1133, in which this court referred to certain rules applying to cases involving the contract of a parent "to surrender or transfer the custody or control of his child \* \* \*" to third persons. The quotation shows, among other things, that in such cases it is presumed that the parent's surrender of the child's custody is only temporary, unless the contrary clearly appears; and that the matter hinges, not upon the third party's understanding, but upon its being clearly established that the parent's understanding was that the contract was for permanent, rather than temporary, custody. In several respects, the facts of the cited case parallel those here, and the court therein referred to several rules, and principles, of law,

which, if applied to this case, would go a long way in persuading us that petitioner should prevail on the merits of her argument. But, after having carefully examined the record, we are not certain the trial court did consider, or that it should have considered, this a custody contract case. If he did, then, from his findings, he must have considered such contract, or agreement, effective as of November 24, 1963—the date Franki Ann was flown to Oklahoma and the date said court apparently considered that her domicile and/or residence changed from Texas to Oklahoma. But, unquestionably, respondent's evidence did not discharge her burden of proving that there was any agreement between her and the petitioner pertaining to more than Franki Ann's temporary care, even if we reject petitioner's testimony to the effect that the difficulty of trying to cope with the hereinbefore described family emergencies, and of caring for Franki Ann, at the same time, was partly responsible therefor, and we assume that her *only* reason for sending her to Oklahoma was to afford Franki Ann an opportunity to get over a nervous condition that had come about from residing in the same Texas city where both her drinking, harassing father, and her stepfather, resided. Respondent was her own only witness in regard to that matter. That part of her direct examination in which she related what was said when petitioner arranged with her, by long distance telephone, for Franki Ann to come here, shortly before putting her on an Oklahoma City-bound airliner, at Houston, is as follows:

"Q Prior to the time that the child had come up here, had Mrs. Hollock called you and asked you if you would take the child?

"A We were getting ready for Sunday School, Sunday morning and Mrs. Hollock called me and said, 'Mama, can you take Franki Ann, *finish the semester or the rest of the term and maybe longer?*' She said, 'I am having trouble and my doctor says she is— and her doctor says that she is going to

be neurotic if she doesn't get away from here.' She said, 'I have called my brother and he can't take her because Mother is sick.' She said, 'Now if you can't do it, say so because one of my sisters can because I have to make other arrangements if you can't', and we were more than happy to take her.

"Q   So she sent her up?

"A   We met here, at three-thirty. * * *" (Emphasis ours).

With reference to the hereinbefore mentioned trip petitioner made from Houston to Midwest City, on March 4, 1964, after her physician had indicated it was safe for her to travel, but from which she returned to Houston without Franki Ann, respondent testified, in part, as follows:

"A   She came one morning.  I got up in the morning and she was sitting in my living room on the sofa.  And I said, 'Well how come you are here so early', because *we had expected her the last of the week.*  She said, 'I have come to get my daughter,' and the daughter's room is near the front door and she heard her mother and she awoke.  So she had been there since three-thirty.  And when I went in she said that she looked like she was mad at me and I said, 'Well, we didn't expect you so soon.'  And Franki Ann was saying, 'Mother, please don't take me.   Please don't take me.'   And patting the seat on the other side for me to come and sit beside her.  I said, "Arty, what do you mean disturbing the child in school again when you have upset her out there in November?'  *I supposed she was going to take her.*" (Emphasis supplied).

We think the above excerpts from respondent's testimony lend corroboration to petitioner's testimony to the effect that her sending Franki Ann to respondent's home was only temporary and for a short, or at least indefinite, period, and that both of the adults directly involved understood that, by so doing, petitioner was not relinquishing her legal custody of the child, nor divesting herself of the right to have Franki Ann returned to Houston at any time she required it.

Petitioner's theory is that, if the arrangements between her and respondent were for the latter to take care of Franki Ann only temporarily, then Franki Ann's coming to Oklahoma could not affect the matter of her permanent custody; and, as petitioner asserted in her motion to vacate, the trial court lacked jurisdiction to enter the judgment it did.  On the other hand, respondent asserts that: "Intention of a person as to the place of his residence or domicile is a question of fact  *  *  *" to be resolved by the trier of facts; but the only intimation she gives as to the identity of the person whose intention is to govern in the matter of a child's domicile is her assertion of the well-recognized principle that a child's domicile is the same as that of the parent having its custody.  She cites opinions of this court recognizing that principle; and, it appears that we are among the majority of courts conforming to it. Thus, in Lyons v. Egan, 110 Colo. 227, 132 P.2d 794, 798, we find the following:

"  'The minor child's domicile, in the case of divorce or judicial separation of its parents, is that of the parent to whose custody it has been legally given;  *  *  *.'  Restatement of the Law, Conflict of Laws, Domicil, section 32."

And, in the Annotation beginning at 13 A.L.R.2d 306, it is said at page 313:

"The domicil or residence of an infant whose parents have been divorced and whose custody has been awarded to its mother by a court having jurisdiction for such purpose is generally held to follow her domicil where such right of custody is actually exercised."

As to related questions, see Wear v. Wear, 130 Kan. 205, 285 P. 606, 72 A.L.R. 425; Roberts v. Roberts, 300 Ky. 454, 189 S.W.2d 691, and other cases annotated at 9 A.L.R.2d 434, 450, 452, 454–457.  There can be no question but that prior to November

24, 1963, Franki Ann's domicile was the same as that of the petitioner—in Houston, Texas; and, it must be presumed to have remained there as long as petitioner had, and exercised, her legal custody, or until a new domicile was acquired (McKiddy v. State, Okl., 366 P.2d 933) which acquisition the minor could not accomplish sua sponte. In the present case, the evidence was wholly insufficient to overcome such presumption; and there is no proof that petitioner ever abandoned, or relinquished to respondent, the legal custody of, or right to control, Franki Ann. On the contrary, the record indicates that she has continued to assert and exercise those rights, except when prevented by physical disability, or made difficult by circumstances over which she had no control, before being stopped by the order and judgment of the trial court.

If Franki Ann's domicile was still in Texas at the time this controversy arose, then it would appear that under Motichka v. Rollands, 144 Wash. 565, 258 P. 333, which petitioner urges us to follow, the trial court had no jurisdiction to enter an order having the effect of changing or modifying the Texas divorce decree's provisions for Franki Ann's custody. In the cited case, the court said, in substance, that the matter of the desirability of changing a child's custody, on account of changed conditions affecting its welfare, from that previously fixed by a divorce court in Montana, the state of the child's domicile, was a subject foreign to that Washington court's inquiry in that habeas corpus proceeding, the child never having been domiciled in Washington, but only temporarily sojourning there. In following the Motichka case in the later case of Ex parte Burns, 194 Wash. 293, 77 P.2d 1025, the same court said, in substance (p. 1030) that not to allow the court having original jurisdiction of the child's custody, and of its present domicile, to determine custody under changed conditions, would encourage taking children from one jurisdiction to another and invite litigation over their custody, and by placing that matter in an "inchoate condition", seriously inter-

fere with the children's welfare. It is not difficult to discern the possible effect of such a situation upon a child's sense of security. See also Jones v. McCloud, 19 Wash.2d 314, 142 P.2d 397, wherein the same court reversed the trial court, and directed it to enter a judgment upholding the original, and continuing, custody the child's father had enjoyed in Oregon "to the end that" the father could take the child to their home there where its custody might be further considered and adjudicated " * * * if petitioned for by (in) the courts of that state."

As shown by the annotation at 4 A.L.R.2d 7, there is a diversity of opinion in various states of this Nation on the issue before us. The general rule, however, is referred to at page 41 of said Annotation as follows:

"* * * even in the face of an admittedly valid existing award of custody rendered by a competent court of a foreign state, a court will nonetheless have jurisdiction to make a custody award on behalf of the state as parens patriae, notwithstanding that the child in dispute is domiciled without the state and is only in the state for the time being."

In a case cited in a quotation from another case in respondent's brief, Chapman v. Walker, 144 Okl. 83, 289 P. 740, we held:

"The judgment of a court of a sister state awarding the custody of a child will be sustained by the courts of this state, *unless it is shown that the conditions affecting the welfare of the child have changed* since the judgment of the court of the sister state *and* that *the child is lawfully domiciled* within this state."

But our decisions since the Chapman case have demonstrated that we have regarded the expression "lawfully domiciled" in the quoted opinion as having particular reference to the circumstances under which the child was brought from one state to another. Some of these decisions were referred to and discussed in Clampitt v. John-

son, Okl., 359 P.2d 588, in which we said inter alia (p. 594):

"The general rule appears to be that if a court of a sister state enters a valid and binding order or judgment concerning the custody of minor children, such order or judgment will be recognized by the courts of this state as a matter of comity, and the courts of this state will not assume or exercise jurisdiction to relitigate the question as to custody unless the child or children are lawfully and legally within this state.

\* \* \* \* \* \*

"However, an exception to the general rule should be allowed by the courts of this State where the welfare of the child is in jeopardy or some other unusual circumstance exists.

\* \* \* \* \* \*."

Here, where the question is squarely presented, we hold that this rule governs, despite the fact that the minor's domicile, at the time such change, or modification, was applied for and issued, was still within the territorial jurisdiction of the court that issued the previous decree. It follows therefore, that the trial court in the present case committed no error in refusing to vacate, on jurisdictional grounds, its judgment of June 2, 1964, if said judgment's change of Franki Ann's custody was justified under the above-quoted exception to the general rule.

But, we have carefully examined the record in this case and fail to find there recorded sufficient evidence showing such justification. With reference to the subject now under consideration, the court made the following findings of fact and conclusions of law (in addition to those hereinbefore set forth):

"VII.

"That since said decree of divorce and order concerning the custody of said child, there has been a material change of conditions effecting the welfare of said child, which change of con-

dition has been conclusively proved by the testimony of the petitioner herself.

"VIII.

"That the material change of conditions hereinabove mentioned caused Frankie Ann Cocanougher, a minor, to be adversely effected in her spiritual, emotional and physical development *prior to* said child being sent to live with her paternal grandmother hereinbefore identified.

"IX.

"That since residing with the paternal grandmother in Oklahoma County, Oklahoma, the undisputed evidence shows that Frankie Ann Cocanougher has overcome extreme nervousness and emotional instability and a feeling of insecurity and a distinct change in her emotional, physical and spiritual development has been made so that she is now well adjusted in her school, church and home life and that she is now happy, secure, emotionally stable and is enjoying active participation in church affairs and the affairs of the home of her paternal grandmother and that to disturb or change her custody at this time would be detrimental to the welfare of said child and would gravely injure her emotional, spiritual and physical development.

"X.

"That the Court, in the hearing of this application for a writ of habeas corpus, by agreement of all the parties and without objection, interviewed the minor child whose custody is herein involved, and finds from said interview that said child is especially intelligent and observant for her age and has sufficient age, capacity and reasoning to form an intelligent opinion and a rational judgment relating to her own interest and happiness, and that said child in said interview expressed to the Court a preference to remain in the home of her paternal grandmother where she has been for the past seven months and advised the Court that she

could not be happy and was nervous and upset in the home of her mother and was happy and contented and felt loved and wanted in the home of her *parental* grandmother where she now is.

*"CONCLUSIONS OF LAW*

\*    \*    \*    \*    \*    \*

"3—That a material change of condition has occurred since the granting of the divorce and the awarding of this child's custody to petitioner on September 29, 1960.

"4—That Frankie Ann Cocanougher is an exceptionally bright child for her age and has the intelligence and capacity to form a rational judgment and that her desire and wishes should be considered in determining her best interests and future happiness and in determining her custody in this matter.

"5—That the best interests of Frankie Ann Cocanougher, a minor, will be served by her remaining in the care, custody and control of her paternal grandmother, the respondent herein, namely: Mrs. Ellen McDaniel, a resident of Oklahoma County, Oklahoma, and that it would be emotionally, spiritually and physically harmful to said child to return the child to the home of the petitioner at this time." (Word emphasis added).

As above indicated, neither the trial court's written findings of fact and conclusions of law, nor its judgment, contain any finding of the petitioner's unfitness to have the care and custody of Franki Ann; and petitioner calls our attention to this under her Proposition III.

Under this, and other propositions, but principally under Proposition II, petitioner cites and quotes opinions of this court announcing, and following, the rule that in actions calling for a determination as to whether legal custody of a child should be decreed in its natural parent, or someone else not so related to it, there should be clear and convincing proof that the parent is unfit for the child's care and custody, before he or she is denied it. Respondent counters by a statement in her Proposition II to the effect that such finding (though not expressed) inhered in the trial court's judgment. She then attempts to demonstrate, by argument and case citations, that the court's findings and judgment pertinent to Franki Ann's welfare and best interests, or the various facets thereof mentioned therein, were tantamount to such a finding of unfitness. Our attention is also invited to the fact that, during the trial, petitioner's counsel rejected the court's offer to make a specific finding on that subject.

An academic discussion of the necessity of such a finding would serve no useful purpose. That subject was referred to in Adams v. Adams, Okl., 294 P.2d 831, 835. We will assume, without deciding, that, in view of the court's findings pertaining generally and indirectly, as well as specifically and directly, to the subject of Franki Ann's welfare and best interests, no such finding was necessary. But, respondent does not contend that *competent evidence* of petitioner's unfitness *is not a prerequisite* to a judgment (like the one here involved) depriving a mother of her minor daughter's custody. She merely argues, in substance, that if provision for the child's comfort and contentment or intellectual and moral development cannot reasonably be expected at a parent's hands, then that parent is unfit to have its custody—so the end result is that the child's welfare overshadows all else. Then she undertakes to show that, in this case, these considerations warranted a change in Franki Ann's custody.

As far as can be determined, the expression "change of condition" in the trial court's above quoted finding "VII", and wherever used in said court's findings of fact and conclusions of law and judgment, can refer only to the conditions that caused and/or contributed to Franki Ann's admitted nervousness and apprehensive demeanor, at the time she arrived in Oklahoma City from Houston. There was no cause for this shown by the evidence except

her father's (Cocanougher's) disturbing telephone calls to her and petitioner and Mr. Hollick, coupled perhaps with the indicated fact that she was probably at home alone for the presumably short period, at least five afternoons a week, between the time her Houston school was out and the time petitioner arrived there from work— when she was employed. Some of respondent's testimony was contemplated to infer that petitioner and her present husband, Hollick, were "having trouble" and/or were separated, and that Franki Ann didn't like him, but. this was of questionable competence, responsiveness, and admissibility; and, judging from respondent's argument, she does not consider such testimony significant. Furthermore, it was not shown whether or not such telephone calls had continued into 1964, and to the time of trial.

Nor does it appear whether or not petitioner was ever employed outside her home after she suffered the near miscarriage hereinbefore mentioned. Respondent testified she had never seen Hollick, and the record is so silent as to him that it is wholly inadequate as a basis for any conclusion as to whether or not petitioner's marriage to him has brought about any change in Franki Ann's daily life that could be considered detrimental to her welfare or best interests, with the possible exception of conceivable results of her father's possible resentment toward, or dislike, or jealousy of him. However, the testimony does reveal that, on one occasion, law enforcement agencies were resorted to for the purpose of stopping Cocanougher's disturbing conduct; and, more importantly, there was no evidence at the trial as to whether or not this latter would ever again be a source of emotional or nervous disturbance to the child, if she returned to Houston. In fact, the record furnishes so little insight into conditions existing in and around the Hollick's Houston household, and as to what Franki Ann's environment and situation there would have been, on March 24, 1964, if she had been returned there on or near that date, that it is difficult to believe that

the trial judge (when he made his temporary order continuing the case until after the remaining nine weeks of her school term) intended to permanently change her custody, without hearing additional evidence pertaining to these subjects. We can only surmise that the judgment he later entered on June 2, 1964, was largely influenced by what the minor herself told him when he talked to her privately and confidentially (date not shown) and, as to which, respondent's brief says: "What the child told Judge Brett is known only to him and God." While we recognize that in cases wherein it is to be determined with which of two adversary parties a child is to live, the child's preference is one of the matters to be considered, if he or she is of sufficient maturity to form an intelligent preference, we have said that the child's whims, wants, and desires are not the criteria. Davis v. Davis, Okl., 355 P.2d 572, 575. Under the rule that has been announced for cases where the contest for custody is between a parent, and others, the only instances mentioned therein where the child's preference is entitled to "especial consideration", are those in which children have been allowed to live with others "a long time". See Bishop v. Benear, 132 Okl. 116, 270 P. 569. In the cited case, we held:

> "The parents have by nature, as well as by law, the legal right to the custody of their minor children. This right will always control the judgment of the courts, unless circumstances of great weight and importance connected with the necessary welfare of the child exist to overcome such strict legal right."

From the record before us, there is little doubt but that when petitioner sent Franki Ann to respondent and her husband, in November, 1963, (for what appears then to have been an indefinite period) fortuitous circumstances had arisen that made it difficult, temporarily, for petitioner to properly care for Franki Ann in her own home. With her knowledge that respondent loved the child, and was retired and had plenty

of time to care for her, it was understandable that petitioner would look to respondent for help in the emergency then facing her. However, there is insufficient evidence to show that in March, 1964, when her husband and mother no longer needed her care, and she was apparently on her way to having a normal pregnancy, she could not have provided for Franki Ann's ordinary comfort and contentment even if it entailed applying again to a Texas court to prevent "the disruptive effects" of Mr. Cocanougher's conduct. Accordingly, we hold that the recorded evidence in this case is not sufficient to meet the requirements of the law where a third party seeks to deprive a natural mother of her own daughter of tender years. The judgment of the trial court is therefore reversed and this cause is remanded with directions to said court to grant the writ petitioner sought.

HALLEY, C. J., JACKSON, V. C. J., and WILLIAMS and IRWIN, JJ., concur.

BERRY, J., concurs in result.

DAVISON, J., dissents.